UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| US CITRUS SCIENCE COUNCIL; SANTA PAULA CREEK RANCH; CPR FARMS; GREEN LEAF FARMS, INC.; BRAVANTE PRODUCE; and RICHARD BAGDASARIAN, INC., | CASE NO. 1:17-cv-00680-LJO-SAB |
|---|---|
| Plaintiffs, | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| v. | ECF No. 29 |
| THE UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, Secretary of Agriculture; and KEVIN SHEA, Administrator, Animal and Plant Health Inspection Service, | |
| Defendants. | |

# I. **INTRODUCTION**

Plaintiffs US Citrus Science Council ("Council Plaintiff"); Santa Paula Creek Ranch; CPR Farms; Green Leaf Farms, Inc.; Bravante Produce; and Richard Bagdasarian, Inc. (collectively, "Grower Plaintiffs") bring this action against Defendants United States Department of Agriculture ("USDA"), Sonny Perdue, Secretary of Agriculture, and Kevin Shea, Administrator, Animal and Plant Health Inspection Service ("APHIS") (collectively, "Defendants" or the "Government"), to challenge a rule allowing for the importation of lemons from Argentina (the "Rule" or "Final Rule"). Defendants move to dismiss the action on the grounds that Plaintiffs lack standing and therefore that this Court lacks subject matter jurisdiction. This matter is suitable for disposition without oral argument. *See* Local Rule 230(g).

## II. BACKGROUND

**A.      Statutory Framework**

### 1.      Plant Protection Act

The Plant Protection Act ("PPA") authorizes the Secretary of the USDA to issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." 7 U.S.C. § 7711(a). The Secretary delegated that authority to APHIS, an agency within USDA. 7 C.F.R. §§ 2.22(a), 280(a)(36). Pursuant to the PPA, APHIS has issued a number of regulations regarding the conditions under which fruits and vegetables can be imported into the United States.

### 2.      Regulatory Flexibility Act

The Regulatory Flexibility Act ("RFA") requires that agencies issuing rules under the Administrative Procedure Act ("APA") must publish a final regulatory flexibility analysis assessing the negative impact of the rule on small businesses. 5 U.S.C. §§ 603, 604. However, the agency does not need to engage in flexibility analysis if the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605(b).

Such an analysis must meet certain statutory requirements. It must state the purpose of the relevant rule and the estimated number of small businesses that the rule will affect, if such an estimate is available. In addition, each analysis must summarize comments filed in response to the agency's initial regulatory flexibility analysis, along with the agency's assessment of those comments. Finally, each analysis must include "a description of the steps the agency has taken to minimize the significant economic impact" that its rule will have on small businesses, "including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." § 604(a)(5).

**B.** **Regulatory History**

Since 1947, regulations under the PPA and its predecessor statutes have barred the importation of lemons and other citrus from Argentina. (FAC ¶ 36 & n.24.) In 2000, APHIS promulgated a rule lifting the ban on importing lemons from Argentina, but the regulation was vacated because APHIS had failed to analyze and explain the risks involved. *See Harlan Land Co. v. U.S. Dep't of Ag.*, 186 F. Supp. 2d 1076 (E.D. Cal. 2001).

In May 2016, APHIS proposed a new regulation that would permit the importation of lemons from northwest Argentina. *Importation of Lemons from Northwest Argentina*, 81 Fed. Reg. 28,758 (May 10, 2016) ("Proposed Rule"). The Proposed Rule acknowledged the presence of certain pests affecting citrus crops in Argentina, but posited that the risk of pests could be effectively mitigated by the use of a "systems approach." *Id.* The "systems approach" outlined procedures intended to ensure the safety of imported lemons, including the responsibilities of the Argentine government's inspection agency ("SENASA"), the preventative measures required by Argentine growers, the mitigation measures required by Argentine lemon packinghouses, and the consequences of a lemon shipment failing inspection at a United States port of entry. *Id.* at 28,759-28,761.

The Proposed Rule was accompanied by an initial regulatory flexibility analysis. *Id.* at 28,762-28763. The analysis estimated that between 15,000 and 20,000 metric tons of fresh lemons would be imported from Argentina annually, causing the price of fresh lemons to drop between 2% and 4%. *Id.* at 28,762. It predicted a corresponding loss to California and Arizona lemon growers between $10.9 and $22 million each year. *Id.* at 28,762. The analysis concluded that the "[e]conomic effects of the rule for both producers and consumers are not expected to be significant." *Id.*

After a period of notice and comment, APHIS published its Final Rule governing the importation of Argentine Lemons. *Importation of Lemons From Northwest Argentina*, 81 Fed. Reg. 94,217 (Dec. 23, 2016) (codified at 7 C.F.R. § 319.56-76) ("Final Rule"). In the Final Rule, APHIS concluded that it would allow the importation of fresh lemons from northwest Argentina, subject to conditions and

requirements articulated in the Final Rule. *Id.* The Final Rule was scheduled to go into effect on January 23, 2017, but was postponed until May 26, 2017. *See Importation of Lemons From Northwest Argentina: Stay of Regulations*, 82 Fed. Reg. 8353 (Jan. 25, 2017); *Importation of Lemons From Northwest Argentina: Stay of Regulations*, 82 Fed. Reg. 14,987 (Mar. 24, 2017). On May 1, 2017, USDA issued a Stakeholder Announcement stating that the previously issued Final Rule would go into effect on May 26, 2017 and announcing that "[f]or 2017 and 2018, Argentine lemons would be imported only into the northeastern United States." *See* USDA, *APHIS Will Not Extend Stay on Import Regulations for Lemons from Northwest Argentina* (May 1, 2017), *available at* https://www.aphis.usda.gov/aphis/newsroom/stakeholder-info/sa_by_date/sa-2017/sa-05/argentina-lemons. The northeast port restriction is referred to by both parties as an amendment to the Final Rule ("Amendment"). The Rule is now effective. *See* 7 C.F.R. § 319.56-76.

## C. Procedural Background

Plaintiffs filed the instant lawsuit on May 17, 2017, challenging the Final Rule and the Amendment promulgated by APHIS under the PPA, APA, National Environmental Policy Act ("NEPA"), and RFA. (ECF No. 2.) Defendants moved to dismiss the original complaint, and Plaintiffs filed an amended complaint ("FAC") on August 10, 2017. (ECF No. 26.) Plaintiffs bring six counts in the FAC: failure to disclose for public comment data, notes, or a trip report for the 2015 harvest season site visit under the PPA and APA (Count I); failure to consider properly SENASA's failed history, and unjustified reliance on SENASA workplan under the PPA and APA (Count II); failure to use notice and comment procedures to amend, and failure to provide reasoned decision-making in amending, the rule to restrict importation to northeastern ports under the PPA and APA (Count III); failure to provide reasoned decision-making under the APA (Count IV); failure to comply with NEPA (Count V); and failure to comply with the RFA (Count VI). Plaintiffs filed an opposition on September 7, 2017. (ECF No. 30.) Defendants filed a reply on September 14, 2017. (ECF No. 32.)

This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-

2202, as well as the APA, 5 U.S.C. §§ 701-706, and the RFA, 5 U.S.C. § 611. Venue is proper in this Court and the matter is ripe for review.

### III. <u>STANDARD OF DECISION</u>

**A.      Rule 12(b)(1) Motion**

A motion to dismiss for lack of subject matter jurisdiction determines whether the plaintiff has a right to be in federal court, whereas a motion to dismiss for failure to state a claim questions whether a cognizable legal claim has been stated. *Tr. of Screen Actors Guild–Producers Pension & Health Plans v. NYCA, Inc.*, 572 F.3d 771, 775 (9th Cir. 2009) (quoting 5B Wright & Miller, Federal Practice and Procedure § 1350 (3d ed. 2004)). A federal court is a court of limited jurisdiction, and may adjudicate only those cases authorized by the Constitution and by Congress. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968-69 (9th Cir. 1981).

"A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may be made as a 'speaking motion' attacking the existence of subject matter jurisdiction in fact." *Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979) (internal citations omitted); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890-892 (3d Cir. 1977); *Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126, 1130-1131 (2d Cir. 1976)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*

In resolving a factual attack on jurisdiction, the district court may review evidence beyond the

complaint. *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003); *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). A proper speaking motion allows the court to consider evidence outside the complaint without converting the motion into a summary judgment motion. *See Safe Air*, 373 F.3d at 1039. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage,* 343 F.3d at 1039-40, n.2. In a speaking motion, "[t]he court need not presume the truthfulness of the plaintiff's allegations." *Safe Air*, 373 F.3d at 1039. Few procedural limitations exist in a factual challenge to a complaint's jurisdictional allegations. *St. Clair v. City of Chico*, 880 F.2d 199, 200-02 (9th Cir. 1989).

The court may permit discovery before allowing the plaintiff to demonstrate the requisite jurisdictional facts. *Id.* A court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are separable from the merits. *Rosales v. United States*, 824 F.2d 799, 802-03 (9th Cir. 1987). However, if the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the court should dismiss for lack of jurisdiction only if the material facts are not in dispute and the moving party is entitled to prevail as a matter of law. Otherwise, the intertwined facts must be resolved by the trier of fact. *Id.*

**B.     Standing**

This Court's Article III jurisdiction "depends on the existence of a 'case or controversy.'" *GTE California, Inc. v. Federal Communications Commission*, 39 F.3d 940, 945 (9th Cir. 1994). "To enforce Article III's limitation of federal jurisdiction to 'cases and controversies, Plaintiffs must demonstrate . . . standing.'" *Nelson v. National Aeronautics and Space Admin.*, 530 F.3d 865, 873 (9th Cir. 2008). To satisfy the Constitution's standing requirement, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or

hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that there injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) at least one of its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

## IV. <u>ANALYSIS</u>

Plaintiffs contend that they have competitive, environmental, and procedural standing to challenge both the Final Rule (Counts I, II, IV, V, and VI) and the Amendment (Count III).

### A. <u>Competitive Standing to Challenge the Final Rule</u>

Plaintiffs argue that they have standing under the doctrine of competitor standing. (ECF No. 30 at 7-14.) Defendants counter that Plaintiffs' theory of competitive injury is too speculative because it only establishes that the domestic lemon industry as a whole will be injured, but not that any of the Plaintiffs in particular will suffer a concrete economic harm.

In order to invoke the doctrine of competitor standing, a party must "first . . . allege[] that the challenged [regulatory] action has caused him injury in fact, economic or otherwise." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970). "[T]he plaintiff [must] show[] an injury to himself that is likely to be redressed by a favorable decision. Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976). When a party asserts only an *indirect* injury, it is substantially more difficult for a court to find standing created by that injury. *Id.* at 44-45; *see also City*

of *Rohnert Park v. Harris*, 601 F.2d 1040, 1048 (9th Cir. 1979), *cert. denied*, 445 U.S. 961 (1980).

Plaintiffs argue that APHIS's own findings that domestic lemon growers would lose between $10.9 and $22 million as a result of the drop in lemon prices establishes an economic injury sufficient for standing. In support of their argument, Plaintiffs point to Ninth Circuit authority for the proposition a regulation that "economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017) (hereinafter "*Teamsters II*") (quoting *Sherley v. Sevbelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)); *see also Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 210-11 (D.C. Cir. 2013) ("*Teamsters I*"). In *Teamsters II*, the court held that union and long-haul truck drivers' associations had constitutional standing to challenge the Federal Motor Carrier Safety Administration's order approving Mexico-domiciled carriers' operation in the United States.[1] *Id.* The court reasoned that the agency action introduced new competition into the market, and thereby made it more difficult for stateside truckers to profit, which created an economic injury. *Id.* The court also concluded that a reversal of the regulation would remedy the union and association's economic injuries. *Id.*

Defendants argue that Plaintiffs have not shown that the predicted effect on the lemon market would cause any one of the Grower Plaintiffs concrete economic injury, and therefore conclude that *Teamsters II* is distinguishable. Defendants point to the fact that Argentine lemons will be imported

---

[1] Defendants contend that the Ninth Circuit did not necessarily decide Article III standing in *Teamsters II* because "the parties' standing had already been settled by the D.C. Circuit in *Teamsters I* (and thus the Government was collaterally estopped from disputing it in *Teamsters II*)." (ECF No. 32 at 2.) The Court disagrees with Defendants' interpretation of *Teamsters II*. Whether the Government was estopped from disputing standing is irrelevant. The issue of standing goes to the court's subject matter jurisdiction, and the Court may raise the issue of its subject matter jurisdiction at any time, *sua sponte*. *Snell v. Cleveland, Inc.*, 316 F.3d 822, 826 (9th Cir. 2002) ("a court may raise the question of subject matter jurisdiction, *sua sponte*, at any time during the pendency of the action, even on appeal"); *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1194 n.2 (9th Cir. 1988) (noting that "[i]t is elementary that the subject matter jurisdiction of the district court is not a waivable matter and may be raised at any time by one of the parties, by motion or in the responsive pleadings, or *sua sponte* by the trial or reviewing court"); *see also* Fed. R. Civ. P. 12(h) ("[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The *Teamsters II* court clearly raised the question of whether plaintiffs had standing in *Teamsters II*, and concluded that plaintiffs had constitutional standing under the doctrine of competitive standing. 861 F.3d at 950-51. That determination is binding on this Court.

primarily during the "months in which U.S. lemon exports are declining and imports are increasing." *Final Rule*, 81 Fed. Reg. at 94,228. They also contend that the lemons will primarily be sold in the northeast, as opposed to California or the west coast. Defendants also note that in some cases the Grower Plaintiffs also sell varieties of lemons other than the non-organic fresh lemons that will primarily be imported from Argentina, and therefore will not compete insofar as they are selling different varieties. Lastly, Defendants point to the inherent uncertainty of prices, and the independent decisions of cooperatives to which the growers belong, as additional reasons why Plaintiffs cannot identify a concrete injury. In essence, Defendants argue that Plaintiffs have not established that the there is a national market for lemons that affects all lemon growers, including Plaintiffs. Defendant construes standing too narrowly, and asks Plaintiffs to prove too much.

First, even if lemons are primarily imported during the off-season for California lemon growers, each Plaintiff still produces lemons during at least some of the months that Argentine lemons will be imported, and therefore they compete directly during those months, at a minimum. (FAC ¶¶ 20-25.) Domestically grown lemons, which have generally accounted for roughly 90% of the fresh lemons consumed in the United States, come almost exclusively from California and Arizona. (ECF No. 29-4 ("Final Regulatory Flexibility Analysis") at i, 2, 7.) During the Argentine import season, they come exclusively from California. (*Id.*); *see also Proposed Rule*, 81 Fed. Reg. at 28,759 (noting that for the 2013/2014 season, "the value of U.S. production of lemons was $647 million, 92 percent earned by California's growers and 8 percent by Arizona's growers"). Moreover, Plaintiffs have alleged that lemons can be stored and sold during the summer season – when Argentine lemons are imported – thereby increasing the amount of time Plaintiffs will compete with imported Argentine lemons. (Final Regulatory Flexibility Analysis at 18-19.) APHIS's own findings indicate that domestic lemons will compete directly with Argentine imports at least some of the year. (*Id.* at 19-20.)

Second, Plaintiffs' argument that the lemons will be imported in northeast ports and therefore will not compete directly is unavailing. As an initial matter, the northeast limitation is set to expire after

2018. The Final Rule itself does not restrict imports to the northeast. Second, even if lemon prices differ across geographic areas, Plaintiffs allege, and common sense dictates, that prices across the nation will nonetheless be inversely affected by an overall influx in supply. *See Adams v. Watkins*, 10 F.3d 915, 923 (1st Cir. 1993) (noting that "[w]hile the law of supply and demand may sometimes be suspended by unpredictable marketplace decisions . . . basic economic theory quite consistently transcends utter randomness by positing elemental laws of cause and effect predicated on actual market experience and *probable* market behavior. Indeed, most "competitor standing" cases depend on such core economic postulates."). Moreover, just because Argentine lemons will not be imported directly on the west coast right away does not mean they will not be sold on the west coast. (FAC ¶ 18 & n.5.) Likewise, Plaintiffs currently supply lemons to the northeast, which has no regional lemon production of its own. (*Id.*) Plaintiffs will compete directly with Argentine imports in that region. The notion that lemon prices within certain geographic regions within the United States are sealed off impervious to the national fluctuations in supply and demand for fresh lemons is illogical.

The fact that the Grower Plaintiffs also sell other varieties of lemons is not material here. All of the Grower Plaintiffs allege that they sell non-organic fresh lemons. Insofar as they do, they will compete directly with Argentine imports. Likewise, Defendants' argument that Plaintiffs do not allege a sufficient harm because unrelated price fluctuations could negate the effects of the imports on the market is inapposite. Prices in any market fluctuate, but APHIS's own predictions show that the increase in supply will lead to a drop in price relative to what the price would otherwise be, and predicts that domestic lemon growers will suffer millions of dollars of economic loss as a result. (Final Regulatory Flexibility Analysis at ii, 9-10.) That is sufficient to establish economic injury. Defendants also argue that cooperatives to which Plaintiffs belong could decide not to reduce prices in response to market forces. The principles of supply and demand indicate that Plaintiffs and other lemon growers who refuse to drop their prices in response to an increase in supply would correspondingly sell fewer lemons and therefore their revenues would still fall. *Adams*, 10 F.3d at 923. The predicted future loss to domestic

lemon growers because of increased competition creates a concrete economic injury for Article III standing.

Defendants suggest that the Ninth Circuit's decision in *Regents of University of California v. Shalala* precludes standing here. 872 F. Supp. 728, 736 (C.D. Cal. 1994), *aff'd*, 82 F.3d 291 (9th Cir. 1996). In *Shalala*, the University of California challenged a Medicare regulation that contained a religious order exception on establishment clause grounds. *Id.* The regulation provided that religiously affiliated institutions were not subject to the general prohibition on reimbursement for related party interest (i.e. interest expense incurred through "control ownership, or personal relationship to the borrower"). *Id.* at 732. The University argued that as a competitor of religiously affiliated Medicare providers, it could be subject to competitive injury since religiously affiliated competitors may recover related party interest expense and the University could not. The court held that the University's hypothetical injury was "too attenuated to meet the minimum Article III requirements," reasoning that the court would have to "assume a number of elements in the causal chain between Defendant's action and The Regent's asserted economic injury." *Id* at 736-37. Here, by contrast, the causal chain between the regulation and the harm to lemon growers like Plaintiffs is obvious, and indeed is spelled out by the agency itself in the Final RFA. (Final Regulatory Flexibility Analysis at i-ii, 9-10.) The regulation allows competitors to import fresh lemons to the United States to compete directly with domestic producers such as Plaintiffs. The RFA predicts that the regulation will cost domestic producers millions of dollars. *Shalala* is not on point.

*Teamsters II* is directly on point. APHIS's own findings in the Final RFA establish that Plaintiffs, as lemon growers involved in the national market, will face economic injury as a result of the importation of Argentine lemons. Their injury could be remedied by reversal of the Final Rule.

1    Therefore, they have constitutional standing to pursue Counts I, II, IV, and VI.[2]

2    **B.    Environmental Standing to Challenge the Final Rule**

3           Plaintiffs contend that they have environmental standing based on the risk that imported

4    Argentine lemons will cause certain diseases, such as Citrus Black Spot, to spread to domestic lemon

5    crops. Defendants counter that Plaintiffs' theory of how disease could spread from imported lemons to

6    domestic crops is highly speculative and rests on unsupported assumptions.

7           The Ninth Circuit has recognized that an increased risk of future environmental injury constitutes

8    an injury-in-fact for purposes of standing. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d

9    846, 860 (9th Cir. 2005); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1151-52 (9th

10   Cir. 2000); *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947-48 (9th Cir. 2002). As this

11   court has noted, however, "there is no requirement that the risk of future injury satisfy any particular

12   threshold of significance." *San Luis & Delta-Mendota Water Auth. v. U.S. Dep't of the Interior*, 905

13   F. Supp. 2d 1158, 1170-71 (E.D. Cal. 2012). Plaintiffs need not prove that they are already suffering an

14   environmental harm. *Ocean Advocates*, 402 F.3d 846, 860 (9th Cir. 2005). "If a plaintiff faces a credible

15   threat of harm, and that harm is both real and immediate, not conjectural or hypothetical, the plaintiff

16   has met the injury-in-fact requirement for standing under Article III." *Krottner v. Starbucks Corp.*, 628

17   F.3d 1139, 1143 (9th Cir. 2010).

18          Plaintiffs allege that the importation of Argentine lemons carries significant risks to Grower

19   Plaintiffs' orchards and to Council Plaintiff's member packinghouses and their member growers. In the

20   Proposed Rule, APHIS identified "nine pests of quarantine significance present in Argentina that could

21   follow the pathway for lemons from northwest Argentina to the continental United States." *Proposed*

22

23   [2] Defendants contend, and Plaintiffs do not dispute, that only environmental injury suffices to provide standing under NEPA.
     (ECF No. 29 at 16 (citing *Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Ag.*, 415
24   F.3d 1078, 1103 (9th Cir. 2005) ("[T]o assert a claim under NEPA, a plaintiff must allege injury to the environment;
     economic injury will not suffice.")).) Therefore, competitive standing is not sufficient to establish Plaintiffs standing to
25   pursue Count V, which alleges a failure to comply with NEPA. Environmental standing (and Plaintiffs' standing to
     pursue Count V) will be discussed in the next section.

*Rule*, 81 Fed. Reg. at 28,759. A "quarantine pest" is a pest with "potential economic significance to the area endangered" and is "not yet present there, or present there but not widely distributed and being officially controlled." *Id.*; *see also* 7 C.F.R. § 319.56-2. The report identifies several of the pests as presenting a "high risk" and others as presenting a "medium risk," noting that the plant pest risk potential is derived by "by estimating the likelihood of introduction of each pest into the continental United States through the importation of lemons from northwest Argentina." (FAC ¶¶ 11-13, 39-40, 54 & n.83, 59, 64, 123-24.)

Defendants argue that the Amended Complaint "lacks any allegations whatsoever" regarding a "geographic nexus" for environmental risk. (ECF No. 29 at 15.) Defendants point to *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153 & n.3 (2010), where plaintiffs established a significant risk of seed contamination by emphasizing the high concentration of alfalfa farms, discussing how alfalfa is pollinated by bees, and describing the large range bees travel. (ECF No. 29 at 15-16.) As an initial matter, Defendants conflate sufficiency and necessity: they cite nothing that implies that Plaintiffs *must* map out exactly how the disease will spread in excruciating detail to allege a significant risk. Certainly such a showing might tend support Plaintiff's position that the environmental risk is significant, but the Court is not aware of any independent geographic nexus requirement akin to the one described by Plaintiffs. Second, APHIS's own findings in the Proposed Rule identify no less than nine pests that pose either a "medium" or "high" risk to domestic lemon crops if Argentine lemons are imported into the United States. 81 Fed. Reg. at 28,759. Defendants' contention that Plaintiffs claims are speculative and conclusory contradict APHIS's findings that importation presents a significant threat of introducing harmful pests not yet present in California. Third, Plaintiffs do identify how pests, even those carried on lemons imported only in the northeast, could spread to California crops and cause damage. As the FAC explains, there is a significant risk that Argentine lemons will reach California through national distribution. (FAC ¶¶ 123-24.) From there, pests can spread through residential citrus crops to commercial crops, due to the ubiquity of residential citrus in Southern and Central California. (*Id.* ¶¶ 11,

64, 123-28.) Indeed, Plaintiffs allege that residential citrus in Southern and Central California have been known to facilitate the spread of disease to commercial crops in the past. (*Id.* ¶ 123 & n.171.)

Defendants also argue that Plaintiffs have not adequately alleged that there is a significant risk of pest transmission in light of the Final Rule's proposed "systems approach" which it argues mitigates the risk that diseased citrus will be imported from Argentina. Defendants arguments conflate standing and merits questions. Plaintiffs allege, as APHIS concluded in its Proposed Rule, that pests present in Argentine lemons pose a significant risk to domestic lemons crops. 81 Fed. Reg. at 28,759. Defendants do not rebut the well-supported allegation that these pests pose a significant risk. Instead, they argue that the Final Rule adequately addresses these concerns such that the risk is not significant. However, Plaintiffs allege that the systems approach is not sufficient to mitigate the environmental risks for a variety of reasons, including that SENASA is unwilling or incapable of abiding by the systems approach, and that APHIS's assessment of the risk of Citrus Black Spot is fundamentally flawed. (FAC ¶¶ 41-44, 58-63.) At this stage, we take Plaintiffs' well-pleaded allegations as true. Defendants' argument that the systems approach is sufficient and therefore that there is no environmental harm goes to whether the Final Rule was properly constructed, and is therefore properly addressed on the merits.

*Save Our Heritage, Inc. v. FAA*, 269 F.3d 49 (1st Cir. 2001) is instructive. In that case, the court considered a challenge brought by local preservationist organizations, towns, and stewards of several historic sites to the FAA's decision to allow additional airline flights near those sites. The FAA objected on standing grounds, arguing that the flights "will have no significant environmental impact." *Id.* at 56. The court concluded that the FAA's arguments "appear[ed] to be a question of merits rather than one of standing; petitioners certainly allege substantial effects and challenge both the FAA's contrary findings and the procedures used to reach them." *Id.* Plaintiffs allegations here, combined with the agency's own findings, adequately establish a significant risk of harm from pests caused by the importation of Argentine lemons. *See Hawai'i Orchid Growers Ass'n v. U.S. Dep't of Agr.*, 436 F. Supp. 2d 45, 50-52 (D.D.C. 2006) (plaintiff's allegations that pest that threatened Hawaiian orchid population could be

introduced through imported orchid plants was sufficient for Article III standing), *aff'd sub*

*nom. Hawai'i Orchid Growers Ass'n v. Johanns*, 249 F. App'x 204 (D.C. Cir. 2007). The "likelihood

and extent of impact" of the alleged environmental harm are questions should be addressed with the

merits. *Save Our Heritage*, 269 F.3d at 56. Plaintiffs have established environmental standing by

showing that there is a significant risk of environmental injury that would be caused by the Final Rule

and remedied by its reversal. Plaintiffs have standing under this theory to pursue Counts 1, II, IV, V, and

VI.[3]

## C. Standing of U.S. Citrus Science Council

Defendants also argue that the Council Plaintiff lacks standing to bring any claims because the

organization itself has not suffered a concrete injury, nor has it alleged sufficient facts from which to

conclude that it has standing to represent the interests of its members. Plaintiffs counter that the Council

has standing to bring suit on behalf of its members under the doctrine of associational standing because

its members would have standing in their own right.

"An association has standing to bring suit on behalf of its members when its members would

otherwise have standing to sue in their own right, the interests at stake are germane to the organization's

purpose, and neither the claim asserted nor the relief requested requires the participation of individual

members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528

U.S. 167, 181 (2000).

The Council is a non-profit California Mutual Benefit Corporation composed of citrus

packinghouses. (FAC ¶ 17.) The FAC explains that several such member packinghouses are composed

of individual lemon growers from throughout California. (FAC ¶¶ 17-25.) For example, Council

member Saticoy Lemon Association is a cooperative packinghouse, composed of 170 lemon grower

---

[3] Because Plaintiffs have substantive economic and/or environmental standing a sufficient to establish this Court's subject matter jurisdiction as to Counts I, II, IV, V, and VI of FAC, the Court need not address Plaintiffs' arguments regarding procedural standing. Count III is addressed separately below.

members, that handles more than 6 million cartons of fresh lemons per year.

Defendant argues that Council Plaintiff has not identified the Council's members in a manner sufficient to establish standing. However, the Ninth Circuit does not require each member to be identified where their injuries are readily apparent. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured."). Indeed, to obtain associational standing, the entity need only show that "as least one" of its members would have standing to sue in [its] own right." *Fleck & Assocs., Inc. v. Phoenix, City of, an Arizona Mun. Corp.*, 471 F.3d 1100, 1105 (9th Cir. 2006). The Court has already determined that Grower Plaintiffs, each of which belong to a packinghouse that is a member of the Council, have standing to sue in their own right. *Catholic Benefits Ass'n LCA v. Sebelius*, 24 F. Supp. 3d 1094, 1100 & n.7 (W.D. Okla. 2014) (determination that cooperative's member had standing to sue necessarily implied that cooperative had associational standing). Since the packinghouses would each have standing to sue on behalf of their grower members, the Council also has standing to sue on behalf of its member packinghouses.[4] *New York State Club As''n, Inc. v. City of N.Y.*, 487 U.S. 1, 9 (1988) (concluding that nonprofit association, consisting of a consortium of 125 private clubs and associations, had standing on behalf of its member associations to challenge constitutionality of a city law, as those member associations would have standing to bring the same suit on behalf of their own individual members). Moreover, Council Plaintiff has also established

---

[4] Plaintiffs argue that the Council cannot establish standing based on its members' members, arguing that a "double layer of membership" cannot satisfy associational standing, citing *Hope, Inc. v. DuPage Cty.*, 738 F.2d 797, 814 (7th Cir. 1984). *Hope, Inc.* is distinguishable. There, plaintiff represented a group of direct service organizations that sought standing on behalf of those organizations' beneficiaries – low income individuals seeking housing. *Id.* The court concluded that because those individuals could not be said to be members of plaintiff's members, plaintiff's representational capacity did not extend to them. *Id.* Here, by contrast, the growers represented by the packinghouses and cooperatives have a concrete relationship with the Council's actual members. Furthermore, more recent Supreme Court precedent dictates that Plaintiffs can rely on a "double layer" of membership to establish associational standing. *New York State Club As''n, Inc. v. City of N.Y.*, 487 U.S. 1, 9 (1988) ("consortium has standing to sue on behalf of its member associations as long as those associations would have standing to bring the same challenge" on behalf of their members).

standing based on the harm to its packinghouse members directly. The FAC alleges that the economic and environmental effects of the Final Rule threaten to "reduce the volume of lemons packed by both private and cooperative packinghouses" and will "force the packinghouses to curtail their operations." (FAC ¶¶ 17, 18 & n.6). APHIS itself found that domestic production would decrease by between 4,000 and 9,500 metric tons in response to the Rule. (Final Regulatory Flexibility Analysis at 10, 12.) Therefore, the Council has established standing through injury to its members.[5]

**D.** **Standing to Challenge the Amendment Limiting Importation to Northeast Ports, as Alleged in Count III**

Count III of the FAC alleges that "APHIS violated its duty to use notice-and-comment procedures to amend its regulations when it announced, on the cusp of the Rule taking effect, that '[f]or 2017 and 2018, Argentine lemons w[ill] be imported only into the northeastern United States.'" (FAC ¶ 111.) The Amendment to the Final Rule is first referenced in the Stakeholder Announcement setting the date that the Rule was to become effective. (FAC ¶ 9.)

Defendants argue that even if Plaintiffs have standing to bring the other claims, Count III must be dismissed because it cannot be redressed by a favorable decision. Defendants argue that a favorable decision on Count III, which challenges APHIS's decision to limit importation to northeast ports for 2017 and 2018, would only allow Argentine lemons to be imported to *any* port in the United States. This outcome would not redress Plaintiffs' identified economic or environmental harms stemming from the Final Rule. Defendants contend that Plaintiffs are not injured by the Amendment, only by the Final Rule itself. Therefore, they do not have standing to challenge the Amendment.

---

[5] Defendants only challenge the first prong of the associational standing test. They do not argue that the interests at stake are not germane to the Council's purpose, nor that the participation of individual members is required. Both prongs are easily satisfied. First, the Council's stated "specific purpose" is to "protect citrus crops from phyto-sanitary risks imposed by the potential entry into the United States of citrus fruits from infected production areas." (FAC ¶ 17.) The Final Rule challenged in this suit would allow lemons to be imported from an infected production area. The interests that Plaintiffs seek to protect through this lawsuit are germane to the Council's purpose. Second, neither the claim nor the requested relief relies on individual members. Council members are not seeking individual damages. Rather, Plaintiffs seek to overturn the Final Rule, which does not require the participation of individual members. *See Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988) (facial challenge to city ordinance did not require participation of association's individual members).

17

Plaintiffs counter that they seek to vacate the Final Rule as a whole because of the procedural and substantive failures of APHIS's late amendment providing that the port of entry to the northeast for a two year period. Since they seek to vacate the entire Rule, and not just the improper amendment, Count III should not be dismissed on redressability grounds.

Count III challenges the failure to use notice and comment procedures to amend the Final Rule, and the failure to provide reasoned decision-making in amending it. (FAC at 45.) To the extent that Plaintiffs make a substantive challenge to the Amendment, Defendants are correct that the challenge does not meet the redressability requirement for standing.[6] *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 146 (D.C. Cir. 2012) (denying standing for lack of redressability because the challenged rules on the timing and tailoring of the greenhouse gas rule "actually mitigate[d] Petitioners' purported injuries," noting in particular that reversal of the timing rule to which Petitioners objected would have subjected them to the objectionable greenhouse gas rule even sooner), *aff'd in part, rev'd in part on other grounds sub nom. Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, and *amended sub nom. Coal. for Responsible Regulation, Inc. v. Envtl. Prot. Agency*, 606 F. App'x 6 (D.C. Cir. 2015).

However, "one who challenges the violation of 'a procedural right to protect his concrete interests can assert that right without meeting all the normal standards' for traceability and redressibility." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 782-83 (9th Cir. 2014) (quoting *Lujan*, 504 U.S. at 572 n.7). To establish procedural standing, plaintiffs must demonstrate that they had a procedural right that "if exercised, *could* protect [their] concrete interests and that those interests fall within the zone of interests protected by the statute at issue." *Id.* (internal citations and quotation marks omitted). In short, the procedural injury inquiry asks whether it would have made a difference to Plaintiffs concrete interests if Plaintiffs had the opportunity to exercise their procedural rights through

---

[6] Plaintiffs argue that the Amendment undermines the Final Rule itself, because it suggests that APHIS and the USDA recognized that their rule-making was flawed and sought to address it through the Amendment. The Amendment is part of the administrative record and Plaintiffs are free to make that argument in connection with their other challenges to the Final Rule. However, that argument does not support substantive standing to challenge the Amendment alone as alleged in Count III.

notice and comment on the Amendment.

Plaintiffs interests with respect to the Amendment in this have not been "adversely affected *by the procedural deprivation*" identified here. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). Plaintiffs argue that they were adversely affected by the Final Rule itself, not the deprivation of their procedural rights with respect to the Amendment.[7] Indeed, Plaintiffs do not allege that they were injured by the Amendment at all. Plaintiffs' concrete interest in this case – preventing environmental and economic harm as a result of Argentine lemon imports – do not stem from, or logically pertain to, the Amendment. They stem only from the Final Rule. Plaintiffs may have adequately alleged a procedural *violation* with respect to the Amendment, but they have not alleged a procedural *injury*. Plaintiffs lack standing to pursue Count III.

**E.     Standing under the Regulatory Flexibility Act**

Defendants also argue that Count IV, which challenges the USDA's compliance with the RFA, must be dismissed because: (1) the RFA only permits judicial review for small entities and Plaintiffs fail to allege that they are small entities, and (2) the RFA permits review only for small businesses that are directly regulated, not those who are indirectly affected. Plaintiffs counter that at least one of the Council Plaintiff's members is a small entity under the RFA and that indirectly regulated entities do have standing under the RFA.

As to Defendants' first contention that Plaintiffs are not small entities, Plaintiffs respond that many members of the Council are small entities as defined by the RFA. Plaintiffs allege specifically that one of the Council's members, Ladera Fruit Company, is a small entity as defined by the RFA. (FAC ¶

---

[7] Plaintiffs do not allege, and there is no evidence in the record to suggest, that the Amendment might have been structured in such a way that it would have been *more favorable* if Plaintiffs had the opportunity to weigh in through notice and comment. Even if Plaintiffs had made such a suggestion, the Court is aware of not authority that would support the proposition that failure to obtain an even more favorable amendment would have been a sufficiently concrete procedural injury for standing purposes where the plaintiff was not injured by the challenged amendment to begin with. *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d at 146; *Town of Babylon v. Fed. Hous. Fin. Agency*, (plaintiffs did not allege a procedural injury where, even if regulation allowing them to be disfavored was removed, regulated institutions would still be free to treat plaintiffs unfavorably and there was no evidence that the institutions would have acted any differently in the absence of the regulation).

18 n.7.) The FAC states that the Ladera Fruit Company "is a small packinghouse with gross revenues well below $27.5 million annually." (*Id.*) Under the regulations interpreting the law, a packinghouse is a "small entity" if it has gross annual revenues below $27.5 million annually. 13 C.F.R. § 121.201 (NAICS code 115114 ("Postharvest Crop Activities (except Cotton Ginning")); *see also* (Final Regulatory Flexibility Analysis at 39.).[8]

Defendants counter that Plaintiffs have not alleged that Ladera Fruit Company has Article III standing. It is true that while the Council has standing because it has injured members, not every member necessarily has standing. The Court agrees that Plaintiffs must allege that the Ladera Fruit Company has Article III standing, in addition to alleging that it is a small entity, to state a claim under the RFA. However, Plaintiffs' allegations are sufficient to establish that the Ladera Fruit Company has Article III standing. For the reasons discussed above in section IV.A, *supra*, as a fresh lemon packinghouse operating in the national market for lemons, Ladera Fruit Company faces a significant risk of economic loss from the implementation of the Final Rule. (FAC ¶ 18 & n.6; *see also* Final Regulatory Flexibility Analysis at 38-39.) As the FAC alleges, the economic impact of the Final Rule on lemon growers threatens to reduce the volume of lemons packed, which, in turn, would force packinghouses like Ladera Fruit Company to curtail their operations. (FAC ¶ 18 n.7.) The agency concedes in the Final Regulatory Flexibility Analysis that packinghouses may be among the entities affected by the Final Rule. (Final Regulatory Flexibility Analysis at 38-39.)

As to Defendants' second contention that indirectly regulated entities cannot bring challenges under the RFA, their contention is undermined by the plain language of the statute. Section 611(a)(1) provides that "a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of" the RFA. 5 U.S.C. § 611(a)(1). The

---

[8] The Council also alleges that it represents the "vast majority of growers of fresh lemons in the United States." (FAC ¶ 17.) Since APHIS determined that the most lemon growers qualify as small entities, the Council necessarily represents a number of small entity lemon growers affected by the Final Rule. (Final Regulatory Flexibility Analysis at ii ("The majority of businesses that may be affected by the final rule are small entities, including lemon producers, packers, wholesalers, and related establishments.").)

statutory language itself does not preclude entities that are aggrieved but not directly regulated from challenging agency compliance. Defendants point to *Mid-Texas Electric Co-operative, Inc., v. FERC*, 773 F.2d 327, 340-41 (D.C. Cir. 1985), to support their position that indirectly regulated entities lack standing under the RFA, but do not explain how the case supports their interpretation. When *Mid-Texas Electric* was decided, § 611(b) explicitly precluded judicial review of the regulatory flexibility analysis prepared under the RFA. 5 U.S.C. § 611(b) (West 1980). That provision of the law was amended in 1996 to allow explicitly for judicial review of the regulatory flexibility analysis as part of the "entire record of agency action." 5 U.S.C. § 611. To the extent that Defendants argue that judicial review should be limited based on the *Mid-Texas Electric* court's examination of the law and its legislative history, that analysis is no longer relevant in light of the intervening change in law.

Plaintiffs have established standing to bring Count IV under the RFA.

## V. CONCLUSION AND ORDER

For the reasons set forth above, Defendants' motion to dismiss the FAC under Rule 12(b)(1) (ECF No. 29) is GRANTED IN PART AND DENIED IN PART:

1. Count III is DISMISSED for lack of standing;

2. Defendants' motion to dismiss all other counts (Counts I, II, IV, V, and VI) is DENIED.


IT IS SO ORDERED.

Dated:  __October 24, 2017__          _____/s/ Lawrence J. O'Neill_____
                                        UNITED STATES CHIEF DISTRICT JUDGE