**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **US CITRUS SCIENCE COUNCIL; SANTA PAULA CREEK RANCH; CPR FARMS; GREEN LEAF FARMS, INC.; BRAVANTE PRODUCE; and RICHARD BAGDASARIAN, INC.,** | **CASE NO. 1:17-cv-00680-LJO-SAB** |
| **Plaintiffs,** | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| **v.** | **ECF Nos. 35, 37** |
| **THE UNITED STATES DEPARTMENT OF AGRICULTURE; SONNY PERDUE, Secretary of Agriculture; and KEVIN SHEA, Administrator, Animal and Plant Health Inspection Service,** | |
| **Defendants.** | |

## I. <u>INTRODUCTION</u>

Plaintiffs US Citrus Science Council, Santa Paula Creek Ranch, CPR Farms, Green Leaf Farms, Inc., Bravante Produce, and Richard Bagdasarian, Inc. (collectively, "Plaintiffs") bring this action against Defendants United States Department of Agriculture ("USDA"), Sonny Perdue, Secretary of Agriculture, and Kevin Shea, Administrator, Animal and Plant Health Inspection Service ("APHIS") (collectively, "Defendants" or the "Government"), to challenge a rule lifting the ban on lemons imported from Argentina (the "Rule" or "Final Rule"). Both parties move for summary judgment. This matter is suitable for disposition without oral argument. *See* Local Rule 230(g). For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED, and Defendants' cross-motion for summary judgment is GRANTED.

## II. BACKGROUND

**A.      Statutory Framework**

**1.      Plant Protection Act**

The Plant Protection Act ("PPA") authorizes the Secretary of the USDA to issue regulations "to prevent the introduction of plant pests into the United States or the dissemination of plant pests within the United States." 7 U.S.C. § 7711(a). The Secretary delegated that authority to the Animal and Plant Health Inspection Service ("APHIS"), an agency within USDA. 7 C.F.R. §§ 2.22(a), 280(a)(36). Pursuant to the PPA, APHIS has issued a number of regulations regarding the conditions under which fruits and vegetables can be imported into the United States.

**2.      Regulatory Flexibility Act**

The Regulatory Flexibility Act ("RFA") requires that agencies issuing rules under the Administrative Procedure Act ("APA") publish a final regulatory flexibility analysis assessing the negative impact of the rule on small businesses. 5 U.S.C. §§ 603, 604. However, the agency does not need to engage in flexibility analysis if the agency head certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605(b).

Such an analysis must meet certain statutory requirements. It must state the purpose of the relevant rule and the estimated number of small businesses that the rule will affect, if such an estimate is available. In addition, each analysis must summarize comments filed in response to the agency's initial regulatory flexibility analysis, along with the agency's assessment of those comments. Finally, each analysis must include "a description of the steps the agency has taken to minimize the significant economic impact" that its rule will have on small businesses, "including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." § 604(a)(5).

**B.**     **Regulatory History**

Since 1947, regulations under the PPA and its predecessor statutes have barred the importation of lemons and other citrus from Argentina. *See* 7 C.F.R. § 319.28(a)(1)-(3) (2015). In 2000, APHIS promulgated a rule lifting the ban on importing lemons from Argentina, but the regulation was vacated in 2001 because this Court concluded that APHIS relied on faulty assumptions in completing its pest risk assessment. *See Harlan Land Co. v. U.S. Dep't of Ag.*, 186 F. Supp. 2d 1076 (E.D. Cal. 2001).

In May 2016, APHIS proposed a new regulation permitting the importation of lemons from northwest Argentina. *Importation of Lemons from Northwest Argentina*, 81 Fed. Reg. 28,758 (May 10, 2016) ("Proposed Rule"). The Proposed Rule acknowledged the presence of certain pests affecting citrus crops in Argentina, but posited that the risk of pests could be effectively mitigated by the use of a "systems approach." *Id.* The "systems approach" outlined procedures intended to ensure the safety of imported lemons, including the responsibilities of the Argentine government's inspection agency ("SENASA"), preventative measures required by Argentine growers, mitigation measures required by Argentine lemon packinghouses, and APHIS's role in overseeing and inspecting imported lemons. *Id.* at 28,759-28,761.

The Proposed Rule was accompanied by an initial regulatory flexibility analysis. *Id.* at 28,762-28763. The analysis estimated that between 15,000 and 20,000 metric tons of fresh lemons would be imported from Argentina annually, causing the price of fresh lemons to drop between 2% and 4%. *Id.* at 28,762. It predicted a corresponding loss to California and Arizona lemon growers between $10.9 and $22 million each year. *Id.* at 28,762. The analysis concluded that the "[e]conomic effects of the rule for both producers and consumers are not expected to be significant." *Id.*

After a period of notice and comment, APHIS published its Final Rule governing the importation of Argentine Lemons. *Importation of Lemons From Northwest Argentina*, 81 Fed. Reg. 94,217 (Dec. 23, 2016) (codified at 7 C.F.R. § 319.56-76) ("Final Rule"). In the Final Rule, APHIS concluded that it would allow the importation of fresh lemons from northwest Argentina, subject to conditions and

requirements articulated in the Final Rule. *Id.* The Final Rule was scheduled to go into effect on January 23, 2017, but was postponed until May 26, 2017. *See Importation of Lemons From Northwest Argentina: Stay of Regulations*, 82 Fed. Reg. 8353 (Jan. 25, 2017); *Importation of Lemons From Northwest Argentina: Stay of Regulations*, 82 Fed. Reg. 14,987 (Mar. 24, 2017). On May 1, 2017, USDA issued a Stakeholder Announcement indicating that the previously issued Final Rule would go into effect on May 26, 2017, and announcing that "[f]or 2017 and 2018, Argentine lemons would be imported only into the northeastern United States." *See* USDA, *APHIS Will Not Extend Stay on Import Regulations for Lemons from Northwest Argentina* (May 1, 2017), *available at* https://www.aphis.usda.gov/aphis/newsroom/stakeholder-info/sa_by_date/sa-2017/sa-05/argentina-lemons. On August 17, 2017, representatives from APHIS, SENASA, and the Argentine lemon industry signed the final operational workplan, which set forth additional details and procedures for implementing the day-to-day operations of the Rule. *See* Administrative Record ("AR") 28340.[1] The Rule is now effective, *see* 7 C.F.R. § 319.56-76, although Plaintiffs indicate that imports will begin "in full" in March 2018, ECF No. 40 at 1-2.

## C.   Procedural Background

Plaintiffs filed the instant lawsuit on May 17, 2017, challenging the Final Rule and the Amendment promulgated by APHIS under the PPA, APA, National Environmental Policy Act ("NEPA"), and RFA. (ECF No. 2.) Plaintiffs brought six counts in the First Amended Complaint: failure to disclose for public comment data, notes, or a trip report for the 2015 harvest season site visit under the PPA and APA (Count I); failure to consider properly SENASA's failed history, and unjustified reliance on SENASA workplan under the PPA and APA (Count II); failure to use notice and comment procedures to amend, and failure to provide reasoned decision-making in amending, the rule to restrict importation to northeastern ports under the PPA and APA (Count III); failure to provide reasoned

---

[1] The AR is lodged at ECF Nos. 33 & 34. Most of the cited portions of the AR are available on the docket at ECF Nos. 39-9 and 39-10.

decision-making under the APA (Count IV); failure to comply with NEPA (Count V); and failure to comply with the RFA (Count VI). Defendants previously moved to dismiss the FAC on the basis that Plaintiffs lacked standing. The Court dismissed Count III, but concluded that Plaintiffs had standing to pursue Counts I, II, IV, V, and VI. ECF No. 36 ("October 25 Order"). Both parties now move for summary judgment on all remaining claims. (ECF Nos. 35, 37.)

This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201-2202, as well as the APA, 5 U.S.C. §§ 701-706, and the RFA, 5 U.S.C. § 611. Venue is proper in this Court and the matter is ripe for review.

### III. <u>STANDARD OF DECISION</u>

**A.** **<u>Summary Judgment</u>**

The remedy for challenging an agency's decision not to authorize testimony is a separate action in federal court pursuant to the APA. *See In re Boeh*, 25 F.3d 761, 764 n.3 (9th Cir. 1994). In an action brought pursuant to the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "It is well established that once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the 'arbitrary and capricious' standard of review." *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 727 (9th Cir. 2004) (citations omitted).

"Under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mt. St. Helens*, 384 F.3d at 728 (citation omitted). "This standard is narrow and [a reviewing court] may not substitute [its] judgment for that of the agency. Applying the arbitrary and capricious standard, [the] court must determine whether the agency articulated a rational connection between the facts and the choice made." *Id.* (citations omitted). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable

5

basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quotations omitted). "In its paradigmatic statement of this standard, the Supreme Court explained that an agency violates the APA if it has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"Unlike substantive challenges, however, . . . . review of an agency's procedural compliance is exacting, yet limited." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). The reviewing court determines "the adequacy of the agency's notice and comment procedure, without deferring to an agency's own opinion of the  . . . opportunities it provided." *Natural Res. Def. Council v. EPA,* 279 F.3d 1180, 1186 (9th Cir. 2002).

Under the APA, the district court's review of an agency's decision is usually limited to the administrative record. 5 U.S.C. § 706; *see also Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden variety civil suit," but rather "sits as an appellate tribunal"). Therefore the usual "genuine dispute of material fact" standard for summary judgment normally does not apply in an APA case. *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv*., 819 F. Supp. 2d 1077, 1083-84 (E.D. Cal. 2011). Put another way, in the context of reviewing an administrative decision under the APA, there are normally no "disputed facts that the district court must resolve." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*; *see also City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770. Summary judgment is proper if

the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**B.**     **Standing**

This Court's Article III jurisdiction "depends on the existence of a 'case or controversy.'" *GTE California, Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir. 1994). "To enforce Article III's limitation of federal jurisdiction to 'cases and controversies, Plaintiffs must demonstrate . . . standing.'" *Nelson v. Nat'l Aeronautics and Space Admin.*, 530 F.3d 865, 873 (9th Cir. 2008). To satisfy the Constitution's standing requirement, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that there injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In addition, where an organization or association is bringing suit on behalf of its members, that organization or association must demonstrate that: (1) at least one of its members would otherwise have standing to sue in their own right; (ii) the interests it seeks to protect are germane to the organization's purpose; and (iii) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

## IV. ANALYSIS

**A.**     **Standing**

The Court previously determined that Plaintiffs had Article III standing under the doctrines of competitive and environmental standing to bring their claims in Counts I, II, IV, V, and VI. ECF No. 36. The Court further concluded that Plaintiffs had statutory authority under the RFA to pursue Count IV. *Id.* at 19-21. In their motion for summary judgment, Defendants ask the Court to reconsider Plaintiffs'

standing, arguing that, in light of the complete administrative record, Plaintiffs have not established

economic or environmental injuries. Plaintiffs also argue that the Court erred in determining that

Plaintiffs have standing as indirectly regulated entities under the RFA. The Court addresses that

argument separately below. *Infra* at 30.

With respect to Defendants' renewed arguments about competitive standing, the Court is

persuaded that its initial reasoning was correct. *See* ECF No. 36 at 7-12. According to Defendants,

Plaintiffs' declarations in support of their motion for summary judgment suggest that there is an

attenuated chain of causation between Argentine lemon imports and competitive injury to domestic

growers that rests on "speculative contingencies." The Court disagrees. Its initial conclusion that the

Rule caused injury to domestic lemon growers was based primarily on APHIS's *own* conclusions about

likely economic harm to domestic lemon growers. *See* ECF No. 36 at 10 ("APHIS's own predictions

show that the increase in supply will lead to a drop in price relative to what the price would otherwise

be, and predicts that domestic lemon growers will suffer millions of dollars of economic loss as a

result"); *see also* AR16-17, 28, 30. The other arguments raised by Defendants were previously

considered and rejected by the Court.[2] Plaintiffs have economic injury sufficient for Article III standing

based on a theory of competitor standing.

---

[2] Plaintiffs cite *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017), for the proposition that anticipated future harm cannot establish an economic injury sufficient for standing. In *Harris*, six states brought suit to challenge a California statute requiring all eggs sold in California to comply with certain animal care standards. *Id.* at 650. The court determined that states' allegations that the statute would result in fluctuations of egg prices were insufficient to support Article III standing. *See id.* at 553 ("Plaintiffs filed their complaint before the Shell Egg Laws took effect. As a result, their allegations about the potential economic effects of those laws, after implementation, were necessarily speculative."). However, *Harris* is distinguishable for two principle reasons. First, in that case the states sought to establish *parens patriae* standing, which could not be sustained by injury to egg farmers alone, since the egg farmers could have sought private relief. *Id.* at 652-53. Therefore, the analogy to the growers in this case fails. Second, plaintiffs argued that the fluctuations in egg prices would harm consumers. However, the court concluded that egg farms complying with the law would have the choice to, and almost certainly would be able to, pass through the additional cost of compliance to customers. Here, domestic lemon growers are not being subject to additional regulation, increasing their costs across the board, but instead in an increase in *competition*. Therefore, the Court cannot assume that lemon grower plaintiffs will pass through their economic losses to consumers. Moreover, Plaintiffs seek to establish competitor standing based on the regulating agency's *own conclusion* that domestic lemon growers would likely suffer economic harm. That economic injury is concrete enough to establish standing, and indeed is compelled by the Ninth Circuit's decision in *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 950 (9th Cir. 2017), as the Court explained in its October 25 Order. *See* ECF No. 36 at 8-11.

Likewise, the record also supports a finding that Plaintiffs have suffered a non-speculative environmental injury, giving rise to environmental standing. The Pest Risk Assessment conducted by APHIS identified no fewer than seven quarantine pests that would have the potential to be introduced to the United States through exported fruit. AR106-107. Defendants argue that the risk of such pests establishing in the United States is speculative, but that conclusion is contradicted by APHIS's own Pest Risk Assessment. It is undisputed that the unregulated import of Argentine lemons would pose a risk to domestic citrus. The question, therefore, is whether that risk is adequately addressed by the regulation. Whether the systems approach described in the Final Rule is an arbitrary and capricious exercise of APHIS's judgment – or whether it sufficiently mitigates the risks of any quarantine pest establishing on domestic soil – is a question that is bound up in the merits of this case. *See* ECF No. 36 at 15 ("The 'likelihood and extent of impact' of the alleged environmental harm are questions should be addressed with the merits" (quoting *Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 56 (1st Cir. 2001))). The Court will not import a merits determination into the standing analysis. *See Rosales v. United States*, 824 F.2d 799, 802-03 (9th Cir. 1987). APHIS's own pest assessment adequately establishes a risk giving rise to environmental injury and standing.

**B.      Procedural Challenges to the Rulemaking Process**

  **1.      2015 Trip Report**

Plaintiffs argue that APHIS failed to satisfy its obligations to use "transparent and accessible" "processes" under the PPA, 7 U.S.C. § 7712, and to comply with notice and comment procedures under the APA, 5 U.S.C. § 553, by concealing a report detailing APHIS's 2015 trip to Argentina ("2015 Trip Report") until after the close of public comment. Defendants counter that the report was not critical to APHIS's decision, and that the material contained in it was otherwise known and subject to public comment. Therefore, Defendants argue, the non-disclosure was not material. Defendants further contend that the non-disclosure of the 2015 Trip Report is not a cognizable *procedural* challenge to the Final Rule, but is instead a substantive challenge masquerading as a procedural one.

An agency is obligated to "identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). However, "the public is not entitled to review and comment on every piece of information utilized during rule making." *Id.* "Instead, an agency, without reopening the comment period, may use 'supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown.'" *Id.* (quoting *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1402 (9th Cir. 1995)).

If the undisclosed 2015 Trip Report contained information critical to the agency's determination that was also "unique information that was not duplicated in other reports," the nondisclosure deprived Plaintiffs and others of the opportunity for public comment, and the agency determination should be reversed and the comment period reopened. *Idaho Farm Bureau Fed'n*, 58 F.3d at 1403; *Kern Cty. Farm Bureau*, 450 F.3d at 1074. If, however, the report provided only "supplementary" data that "'expand[s] on and confirm [s]' information contained in the proposed rule[ ] and "did not alter the justifications or conclusions that were vital to the listing decision," there was no procedural error in not publishing it. *Kern Cty. Farm Bureau*, 450 F.3d at 1079.

Plaintiffs contend that the information in the 2015 Trip Report was critical because APHIS needed to verify SENASA's oversight of, and compliance with, the harvesting, production, and packinghouse procedures that APHIS was contemplating as part of the systems approach. Defendants dispute the characterization of the report as critical, stating that the purpose of the trip was to assist in the development of the operational work plan, and disputing Plaintiffs' contention that the 2015 site visit was "among the primary bases for concluding that SENASA can comply with the systems approach[.]" (ECF No. 35-1 at 15.) Defendants note that the report summarizing the later September 2016 site visit, which was disclosed to the public for comment, was used in assessing SENASA's oversight capabilities and relied on by APHIS in formulating the Final Rule. (ECF No. 39-1 at 18.)

Whether or not the document was "critical," it certainly was not unique, nor did its non-disclosure prevent meaningful comment on SENASA's oversight capabilities. The 2016 Trip Report addresses the same central issue addressed in the 2015 Trip Report – Argentina's progress in implementing the systems approach. *Compare* AR 26207-34 *with* AR25905-24. Plaintiff argues that disclosure of the 2016 Trip Report was not sufficient, because the 2016 trip took place after the harvest season, and therefore the delegation was not able to observe Argentine growers' compliance with, and SENASA's oversight of, harvesting and packinghouse procedures. However, this subject was addressed in several documents available for public comment, including the Risk Management Document, the Proposed Rule itself, and the 2016 Trip Report. AR25905-24; AR156-59; AR168-70. Indeed, the 2016 Trip Report discusses pesticides used by Argentine growers (including dosages), the fruit fly trapping requirement, harvest and packing requirements, the number of SENASA inspectors, and more. *See* AR25907-13. The information contained in the 2015 Trip Report was duplicative of other information contained in the September 2016 Trip Report, and identified elsewhere throughout the Proposed Rule. However, the September 2016 trip came later in the process, therefore was arguably more central and relevant to APHIS's determination of whether SENASA could reach compliance than the 2015 trip. Therefore, the failure to disclose this report was not material and does not require the reopening of the public comment period. *See Aina Nui Corp. v. Jewell*, 52 F. Supp. 3d 1110, 1122-23 (D. Haw. 2014) (site visit report did not contain new critical information where the information contained therein was largely already contained in the proposed rule and in other documents in the record).

Defendant also draws a distinction between the 2015 Trip Report and the types of "scientific studies" and "complex factual surveys" that courts concluded should have been disclosed in other cases. (ECF No. 42 at 5.); *See also, e.g.*, *Idaho Farm Bureau*, 58 F.3d 1392, 1403 (9th Cir. 1995); *Ober v. EPA*, 84 F.3d 304, 314 (9th Cir. 1996) (reopening public comment). As the Ninth Circuit noted in *Kern County Farm Bureau*, agencies are compelled to disclose documents setting out the "technical basis" for a proposed rule. 450 F.3d at 1076. As Defendants point out, without access to those types of documents,

the public is unable to point out errors in methodology, data selection, and sampling. By contrast, the 2015 Trip Report merely provides a summary of the 2015 site visit. Plaintiffs are not disputing the factual accuracy of the report – there is no methodology or data selection to critique – but rather arguing that the agency should have used the report to reach a different conclusion about whether it could rely on SENASA to execute its obligations under the Final Rule. *Bear Valley Mut. Water Co. v. Jewell*, 790 F.3d 977, 993 (9th Cir. 2015) (agency's failure to disclose studies was not prejudicial where public was on notice of the issues raised in the additional studies and plaintiffs did not challenge undisclosed studies' reliability or conclusions).

Plaintiffs do not identify any entirely unique and material argument or comment that it would have made had the report been disclosed before the conclusion of the notice and comment period. Plaintiffs argue that the report evinces SENASA's continued failure to implement procedures in line with APHIS's requirement – an argument that could equally be based on the disclosed 2016 Trip Report or any number of other documents. In other words, Plaintiffs are not arguing that their comments would have made any substantively unique comments if they had an opportunity to comment on the 2015 Trip Report. Rather, Plaintiff objects that the agency should have considered the information in the report to come to a different conclusion. That argument will be addressed with Plaintiffs' other substantive arguments and APHIS's conclusion will be subject to review to determine whether it was arbitrary, capricious, or an abuse of discretion. *Bear Valley Mut. Water Co.*, 790 F.3d at 993 (rejecting plaintiffs' procedural challenge, noting that plaintiffs "do not challenge the reliability of the studies, but disagree with the [agency]'s interpretation and use of the studies"). Based on the Court's review of that document, the information contained within it was largely duplicated in the disclosed 2016 Trip Report, the Proposed Rule, and other documents in the record.

Moreover, a number of interested parties, including Plaintiffs, *did* address SENASA's oversight capabilities in response to the Proposed Rule. *See, e.g.* AR25656 (identifying potential issues with SENASA oversight under the heading "Questions on SENASA Inspectors"). The robust comments from

the public on the issues related to SENASA's oversight and the site visits leading up to the implementation demonstrates that there was no prejudice in the non-disclosure. *Kern Cty. Farm Bureau*, 450 F.3d at 1076 (agency need not provide opportunity to comment on documents that "expands on and confirms information contained in the proposed rulemaking . . . so long as no prejudice is shown.").

Defendant also notes that the 2015 Trip Report was disclosed primarily in response to comments questioning the nature of the visit. Courts have consistently concluded that an agency may add supporting documentation to the record in response to a comment without having to offer an additional opportunity for public comment, so long as the additional information is not both critical and unique. *See Rybachek v. EPA*, 904 F.2d 1276, 1286 (9th Cir. 1990) ("Nothing prohibits the Agency from adding supporting documentation for a final rule in response to public comments"); *Alaska v. Lubchenco*, 825 F. Supp. 2d 209, 223-24 (D.D.C. 2011) ("Were it otherwise, an agency could find itself stuck in an infinite feedback loop of public comments on responses to public comments").

### 2. Operation Work Plan

Plaintiffs similarly argue that Defendants' failure to produce the Operation Work Plan ("OWP") for public comment was a procedural error warranting reopening of the comment period. The OWP is a document developed jointly by the USDA, APHIS, and SENASA to "detail[] the phytosanitary measures required for production, packing, safeguarding, treatment (if applicable), export certification, and shipping in order to comply with regulations governing the importation of fresh lemon fruit." AR28341. In support of these contentions, Plaintiffs make two principal arguments.

First, Plaintiffs argue that the OWP itself is a legislative rule that should have been subject to notice and comment rulemaking under the APA. They point to apparent discrepancies between the Final Rule and the OWP and suggest that such discrepancies render the OWP a legislative rule that itself should have been subject to notice and comment procedures. Specifically, they argue that the OWP eliminates the requirement that SENASA visit production facilities, eliminates the requirement that discovery of honeydew moths or citrus borers in any stage of development trigger corrective measures,

alters the rule regarding how much fruit will be prohibited from export in the event that pests are found, and omits procedures to ensure compliance with other aspects of the Final Rule.

Second, Plaintiffs argue that under the *Idaho Farm Bureau* standard, the OWP contains critical and unique information regarding the implementation of the systems approach and therefore should have been disclosed during the notice and comment period prior to finalization of the Final Rule. The Final Rule makes frequent reference to the OWP, and the OWP contains specifics about how day to day operations will be overseen and monitored that were not available in any other materials.

Defendants counter each of these arguments. Defendants argue that the OWP is at most an interpretive rule that merely clarifies and explains, but does not replace, the Final Rule. Second, Defendants counter each of the alleged discrepancies between the OWP and the Final Rule, explaining why the two documents are consistent.[3] Lastly, Defendants argue that the scope of the proposed OWP was identified in the Proposed Rule such that Plaintiffs and the public had ample opportunity to comment on it, and that it does not provide essential support for the Final Rule itself under *Idaho Farm Bureau*.

### a.    Legislative Rule v. Interpretive Rule

Under the APA, an agency generally may only lawfully issue a legislative rule by using notice and comment procedures. 5 U.S.C. § 553(b). By contrast, an agency does not need to pursue notice and comment rulemaking to issue an interpretive rule, or interpretive guidance. 5 U.S.C. § 553(b)(A).

> In general terms, interpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule. *Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 449 (9th Cir. 1994). Legislative rules, on the other hand, create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress. *Id.* . . . [W]hen an agency does not hold out a rule as having the force of law, it may still be legislative if it is inconsistent with a prior rule having the force of law.

---

[3] Defendants also argue that Plaintiffs do not have standing to pursue this line of argument, noting that if there are inconsistencies between the Final Rule and the OWP, the only remedy would be to strike those portions, not to reverse the Final Rule in its entirety. Because Plaintiffs allege here that the discrepancies prove that the OWP is a legislative rule, such discrepancies could result in reversal of the Final Rule. Plaintiffs have standing to pursue this argument.

*Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003). The OWP does not fit neatly within either category described in *Hemp Industries*: the OWP is more than an explanation of the rule, but it also does not create new rights or obligations that go beyond what is spelled out in the final rule. Rather, the rule describes the day to day procedure of the systems approach, which is described in more general terms in the Final Rule. The Court therefore turns to whether the OWP is inconsistent with the Final Rule to assist in determining whether the OWP has the force of law.

Plaintiffs identify several provisions in the OWP that they assert are inconsistent with the Final Rule. Plaintiffs argue that the work plan does not require SENASA to "visit and inspect registered places of production regularly throughout the exporting season," as required by the Final Rule. 7 C.F.R. § 319.56-76(b)(5). However, the Court can find no provision in the OWP that relieves SENASA of that obligation. Indeed, the OWP contemplates that SENASA will conduct regular inspections of production facilities. AR28348, § 2.3.4; AR28362, § 3.2.10.1; AR28357, § 5.1. Plaintiffs argue that the OWP requires only "periodic" as opposed to "regular" inspections, and that it otherwise fails to delineate when and how such inspections are carried out. As an initial matter, it is not apparent to the Court that there is a material difference between "regular" and "periodic" inspections. The purported failure of the OWP to provide more specificity on these inspections does not evince a procedural violation. To the extent that the OWP does not provide a more specific plan for inspections of production areas, it does not in any way alleviate SENASA of the responsibility to do so under the Final Rule.

Plaintiffs also argue the Final Rule's requirement that "if a single *C. gnidiella* [honeydew moth] or *G. aurantianum* [citrus borer] in any stage of development is found on the lemons, the entire consignment is prohibited from export to the United States," AR 00014, 7 C.F.R. § 319.56-76(c)(4)(i), is replaced in the OWP, where the discovery of these pests only in the "immature stages" of development would trigger the export prohibition, AR28370. Defendants counter that the mature stages of these pests are moths, and therefore only the immature stages present a risk of being transmitted through imported

lemons "because the adult stages can fly, and do not rely on lemons as host material." (ECF No. 39-1 at 22.) In other words, only the immature stages of these pests are found likely to be found "on the lemon." Moreover, nothing in the OWP presupposes that the discovery of pests past the immature stage would not trigger "corrective measures" – even if those measures did not necessarily result in a prohibition of the export of all fruit in that consignment. Indeed, the OWP does mandate suspensions and other corrective measures and remedial actions when quarantine pests are discovered. AR28356, § 4.2.

Relatedly, Plaintiffs argue that the Final Rule prohibits export of the "entire consignment" whenever inspectors discover pests or mites, 7 C.F.R. § 31956-76(c)(4)(i), (ii), but that under the OWP, only the *"lot"* will be rejected, AR28370. *See* 7 C.F.R. § 319.56-2 (defining a "lot" as "forming all or part of a consignment"). Defendants respond that the inspections referenced in the OWP take place before the lot is designated as part of any larger consignment, and therefore rejection of the lot represents rejection of the largest designated unit in which the pest is discovered. No material conflict exists between the Rule and the OWP. *See* AR28355, § 3.1.4.14 ("Only lots passing inspection will be eligible for consignment").

Lastly, Plaintiffs argue that the OWP impermissibly allows packinghouses to process fruits destined for the United States and other markets at the same time. Defendants respond that the Final Rule requires all fruits being simultaneously processed in packinghouses exporting fruit to the U.S. to process according to U.S. standards. This is not inconsistent with the Final Rule, which requires only that "[d]uring the time registered packinghouses are in use for packing lemons for export to the continental United States, the packinghouses may only accept lemons that are from registered places of production and that have been produced in accordance with the requirements of this section." Therefore, there is no discrepancy between the Final Rule and the OWP in this regard; packinghouses may simultaneously pack fruit for export to the United States and other markets so long as *all* fruit is processed and packed according to the standards set forth in the Final Rule and required for export to the

16

United States.

In sum, the Court does not believe that a reasonable reading of the Final Rule and the OWP evinces any material discrepancies such that the OWP substantively changes the regulation, thereby rendering it a legislative rule. Therefore, the OWP is correctly categorized as an interpretive rule that offers guidance on the day-to-day implementation of the Final Rule under the *Hemp Industries* standard. 333 F.3d at 1087. Ultimately, the OWP does not seek to expand or reduce the scope of the Final Rule, nor does it modify it. Rather, the OWP offers a "crisper and more detailed guidance" on the Final Rule. *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 168 (D.C. Cir. 1997) (quotation marks omitted). Accordingly, because the OWP is not a legislative rule, notice and comment were not required.

Moreover, as a practical matter, the agency should not be hamstrung by the current form of the OWP. So long as their operational work plan complies with the strictures of the Final Rule, the agency has discretion to make incremental decisions regarding how best to execute the systems approach. Requiring notice and comment on the OWP would serve only to lock the agency into specific methods for executing the systems approach. The agency requires some discretion, always within the bounds of the Final Rule, to execute certain aspects of the Rule, especially taking into account technological advances. For example, as the agency points out, it should have "the administrative flexibility to decide that different types of fruit fly traps should be used, or a different attractant should be used." ECF No. 39-1 at 21. The agency has discretion to give further guidance on a Final Rule without subjecting that additional guidance to notice and comment. *Id.* (noting that the agencies "do not develop written guidelines to aid their exercise of discretion only at the peril of having a court transmogrify those guidelines into binding norms subject to notice and comment strictures." (quotation marks and citations omitted)).

### b.      Critical Or Unique Information

Plaintiffs further contend that the OWP should have been disclosed to the public for notice and comment under the *Idaho Farm Bureau* standard, discussed above with respect to the non-disclosure of

the 2015 Trip Report, *supra* at 10. Under *Idaho Farm Bureau*, the agency must produce material if it was critical to the agency's determination and constituted unique information that was not duplicated in other reports. 58 F.3d at 1403.

Here, the OWP functions not as a document that provides the underlying basis for the agency's determinations in the Final Rule, but as a further expression of the Final Rule, and one consistent with its requirements. Moreover, the Proposed Rule clearly set forth the intended subject matter and scope of the OWP, which allowed Plaintiffs ample opportunity to comment on it. AR168-70. For example, the Proposed Rule indicated that the OWP would address treatment for Medfly in lemons harvested yellow, specifications for how lemons destined for export to the United States are safeguarded during transport from production places to packinghouses, and the means of identification for tracing each lemon exported through the United States back to its place of production. AR169. Indeed, the OWP was formulated using the same documents that provided the essential support for the Final Rule – such as the Pest Risk Assessment and Risk Management document. *See* AR61-153; AR154-166. Those documents were properly disclosed, and the OWP does not deal with subject matter outside the scope of what was provided for in the Final Rule or the other essential documents disclosed for notice and comment.

Plaintiffs argue that "changes to the Medfly trapping protocol . . . appear for the first time" in the OWP. The OWP calls for Medfly trapping 35 days before the estimated date of harvest in the second and subsequent years of exporting (AR28364), where the previously disclosed Risk Management Document had called for a one-year period (AR 169). However, the Proposed Rule clearly indicated that the Medfly trapping protocol would appear in the OWP, AR170, and the disclosed 2016 Trip Report, which was available to the public for notice and comment, noted that APHIS and SENASA might shorten the length of time necessary for trapping, AR25905-06, giving the Plaintiffs ample notice and opportunity to provide comment on the appropriate length of time for Medfly trapping. The OWP did not provide any truly unique information such that its non-disclosure deprived the public of opportunity for notice and comment.

In support of their argument that the OWP should have been disclosed under *Idaho Farm Bureau*, Plaintiffs cite *Center for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1093-94 (D. Ariz. 2003), *amended in part*, No. CV 01-409 TUC DCB, 2003 WL 22849594 (D. Ariz. Feb. 19, 2003), which held that the agency committed procedural error in failing to disclose the management plan that it relied on in determining not to designate any critical habitat for the Mexican spotted owl on certain lands. In essence, the agency had determined that the management plan of another governmental body, the San Carlos Apache Tribe, was sufficient to address the habitat issues such that further agency action was unnecessary to protect the Mexican spotted owl in San Carlos Apache territory. The court determined that the agency erred in failing to disclose the management plan, which it principally relied on in coming to its decision. Here, by contrast, the OWP is merely a practical extension of the Final Rule itself, which relied on all of the same underlying documents and studies. Unlike *Norton*, there is no ambiguity regarding the scope and source of the OWP, which was disclosed in the Proposed Rule, and draws in practical effect from numerous other documents disclosed during the administrative proceedings.

Plaintiffs also cited *Friends of the Earth v. Hall*, 693 F. Supp. 904, 948 (W.D. Wash. 1988). In *Hall*, environmental groups challenged a dredge and fill operation approved by the Army Corps of Engineers and the US Navy. *Id.* at 911. The operation called for an in-water disposal system governed by a monitoring plan. The court concluded that the Army Corps of Engineers erred in failing to publish during the public comment period the monitoring plan that was "the single most important feature of the . . . project." *Id.* at 948. The details of the monitoring plan in *Hall* were central to the challenged environmental impact statement. Without disclosing the monitoring plan, environmental groups were entirely unable to effectively comment on the proposed dredge and fill permit. Here, in contrast, the Proposed Rule itself described the proposed phytosanitary mitigation measures in detail, giving Plaintiffs and other members of the public ample opportunity to understand and comment on the plan. The OWP does not provide any information that would be critical to – never mind "the single most

important feature" of – the pest mitigation measures.

The agency did not commit procedural error in not disclosing the OWP, or any interim version of it, for notice and comment.

**C.     Substantive Challenges To APHIS's Decision-Making**

**1.     Reliance on SENASA**

According to Plaintiffs, APHIS's determination that SENASA was capable of complying with and enforcing the systems approach was arbitrary and capricious. First, Plaintiffs argue, the agency could not have made this determination in the first instance prior to completing the OWP, because the agency had not defined the rules with which SENASA was required to comply. Second, APHIS did not take the necessary steps to ensure that SENASA was capable of complying with the rule until they visited Argentina during harvest season only *after* issuing the Final Rule. Third, APHIS unreasonably ignored evidence in the record that SENASA would be unable to implement the necessary phytosanitary measures.

As an initial matter, Defendants counter that Plaintiffs overstate the agency's reliance on SENASA, noting that the agency will maintain thorough oversight under the Final Rule. Defendants also argue that the agency's determination regarding SENASA's capacity to ensure compliance with the systems approach was reasonable, and that Plaintiffs' argument that the OWP and compliance checks should have been completed prior to the promulgation of the Final Rule exceeds what is required under the APA and is otherwise unreasonable.

**a.     APHIS Oversight**

Under the Final Rule, APHIS delegates certain compliance responsibilities to SENASA, but maintains oversight responsibility, and reserves the right to monitor places of production and packinghouses itself "as APHIS deems warranted." 7 C.F.R. § 319.56-76(a)(4). Moreover, the Rule provides that APHIS will be "directly involved with [SENASA] in monitoring and auditing implementation of the systems approach," § 319.56-76(a)(1), that it will determine the places of

production to be free from *B. chilensis* prior to each harvest season, § 319.56-76(b)(1), and that is has

the power to exclude a place of production or packinghouse from the export program until proper

remedial measures are in place, § 319.56-76(b)(6), (c)(5). Lastly, APHIS will set the standards for port-

of-entry inspections in the United States conducted by Customs and Border Protection officials.

§ 319.56-76(d). To the extent Plaintiffs assert that APHIS is relying blindly on SENASA's compliance

with the systems approach set forth in the Final Rule, that notion is flatly contradicted by the significant

APHIS oversight outlined in the Rule itself.

Moreover, APHIS did take significant steps to evaluate SENASA's capacity for oversight, and to

work with SENASA to ensure that they would be able to implement the systems approach. The agency

determined that the "routine reviews and inspections" outlined in the Final Rule were adequate, and

determined that heightened oversight "tantamount to [a] mandatory preclearance program" was not

necessary under the circumstances. AR8. This assessment was based on APHIS's site visits, during

which time it "looked at SENASA's infrastructure and asked questions to address their capacity to

provide oversight" AR2, and also verified information provided by SENASA regarding pests. AR3. The

agency also considered the fact that Argentina is a member of the World Trade Organization, and has

"demonstrated the[ir] ability to comply with U.S. regulations with respect to other export programs.

AR5. The agency further reiterated that APHIS would be "directly involved in monitoring and auditing

implementation of the systems approach in Argentina" and that "[a] determination that the systems

approach had not been fully implemented or maintained would result in remedial actions, including

possible suspension of the export program for Argentine lemons." *Id.* Argentina is already authorized to

export over fifty other fruits and vegetables to the United States under the supervision of SENASA and

subject to APHIS's regulations. AR1352-53.

In *Harlan Land Co. v. U.S. Department of Agriculture*, this court expressed concerns regarding

SENASA's oversight capabilities based in large part on its failure to report an outbreak of foot-and-

mouth disease for several months in 2000. 186 F. Supp. 2d 1076, 1096 (E.D. Cal. 2001) (raising

concerns, in light of the intentional concealment of the foot-and-mouth diseases outbreak, about

"whether SENASA can be entrusted to enforce the mitigation measures used by the systems approach").

Since that decision, issued over sixteen years ago, SENASA has taken significant steps to address its

errors, as APHIS documented in the administrative record. AR26197-24.

Plaintiffs also argue that the agency erred in relying on Argentina's export program to the

European Union as evidence that SENASA was capable of complying with the systems approach,

pointing out that the European Union "repeatedly intercepted citrus shipments from Argentina with the

causal agent of Citrus Black Spot." ECF No. 35-1 at 25 (citing AR250 & n.20). As Defendants point

out, the majority of those interceptions occurred before February 2016, when the EU and SENASA

implemented new measure targeted at intercepting Citrus Black Spot ("CBS"). AR1501-1533. Prior to

that time, the EU did not require specific mitigations for CBS.[4]

Although the interception of any quarantine pests is concerning, the record indicates that

SENASA worked with the EU following these interceptions to implement an action plan aimed at

mitigating the risk of exporting CBS-infected fruit. APHIS also put in place more stringent measures

than those required by the EU which will be overseen by APHIS. It was not unreasonable for the agency

to conclude that SENASA could be relied on to implement its more stringent procedures in light of the

full record. Moreover, this approach is particularly reasonable in light of APHIS's scientific judgment

that CBS is unlikely to follow the commercial fruit pathway, *infra* at 24-26, and therefore unlikely to

present a risk to domestic crops even if infected fruit did make its way to the United States.

---

[4] Plaintiffs ask the Court to consider the fact that, since the implementation of new measures in 2016, the EU has continued to intercept a small number of lemon shipments from Argentina containing CBS. ECF No. 37-2 ¶ 31. Defendants argue that information about CBS interceptions from 2016 and 2017 should not be considered because it falls outside the administrative record. ECF No. 39-1 at 32 n.8. In support of their argument, Plaintiffs cite *Amoco Oil Co. v. Environmental Protection Agency*. 501 F.2d 722, 729 (D.C. Cir. 1974) (considering testimony given after the promulgation of the rule, concluding that it "b[ore] directly upon the plausibility of certain predictions" made by the agency in promulgating the rule). However, more recent Ninth Circuit counsel against considering extra-record evidence unless it falls within one of the narrowly recognized exceptions, none of which appear to apply here. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 992 (9th Cir. 2014). Therefore, the Court will not consider the later interceptions of CBS infected fruit in the EU. *See League to Save Lake Tahoe v. Tahoe Reg'l Planning Agency*, 739 F. Supp. 2d 1260, 1264 (E.D. Cal. 2010) (declining to consider post-record material bearing on the truth of the agency's predictions), *aff'd in part, vacated in part on other grounds, remanded*, 469 F. App'x 621 (9th Cir. 2012).

### b.    APHIS's Evaluation Of SENASA Prior To Completion Of The OWP

Plaintiffs argue that it was irrational for APHIS to conclude that it could rely on SENASA prior to completing the final OWP. Plaintiffs reason that until APHIS outlined exactly what SENASA's oversight responsibilities would be, it could not adequately assess whether SENASA was capable of providing that oversight. This position misconstrues the nature of the OWP and the rulemaking process. As an initial matter, and as this Court concluded above, the OWP is an interpretive rule. The Final Rule sets the parameters of the systems approach, and governs SENASA's responsibilities. The OWP merely flushes out that systems approach. Therefore, APHIS's determination that SENASA was capable of carrying out the oversight outlined in the Final Rule, with APHIS's oversight, was sufficient. APHIS did not need to make additional findings of SENASA's capacity for oversight with respect to the OWP. Moreover, it would be illogical to require APHIS to have an OWP, necessarily dependent on the requirements put in place by the Final Rule, in place before the Rule was finalized.

### c.    APHIS's Evaluation Of SENASA Prior To 2017 Site Visit

Lastly, Plaintiffs argue that it was irrational for APHIS to conclude that SENASA was capable of compliance with the Final Rule prior to completing a final site visit. Plaintiffs argue that Defendants could not reasonably be assured that SENASA was capable of oversight based on the prior site visits alone, which each indicated that SENASA was not yet in full compliance with the Final Rule. Defendants counter that the regulated party, in this case SENASA, need not be in full compliance with the Rule prior to its enactment, and that imposing such a requirement exceeds what is required under the law.

The Final Rule lifts the ban on Argentine lemon imports and imposes a system for imports going forward. It does not authorize any particular entity to begin exporting lemons. The administrative record indicates that authorization will be given to producers and packinghouses that demonstrate full compliance with the requirements of the Final Rule. AR28378. There is no legal or logical support for the notion that APHIS must wait to lift the ban until it ensures 100% compliance with the terms of the

Final Rule. APHIS made several site visits to ensure that SENASA and the Argentine lemon industry were moving towards compliance with the likely terms of the Final Rule prior to its enactment. It was not irrational to rely on its judgment that those entities would continue to move toward compliance in an effort to comply with the Final Rule after it was promulgated, particularly given APHIS's role in overseeing and supervising compliance with the Rule.

## 2. **Scientific Evidence Regarding Citrus Black Spot**

Plaintiffs argue that APHIS arbitrarily and capriciously dismissed new scientific evidence bearing on the risk of the transmission of CBS, one of the quarantine pests present in Argentine lemons. Specifically Plaintiffs accuse the agency of ignoring a 2014 study from the European Union calling into question the conventional understanding – expressed in the agency's Pest Risk Assessment – that CBS cannot be transmitted on citrus fruit without leaves. In the Final Rule, the agency indicated only that they "disagree[d] with the EU regarding the transmissibility of CBS via commercially produced fruit." AR5. Plaintiffs argue that this summary dismissal of the EU study, without additional explanation, was arbitrary and capricious.

Defendants counter that, having thoroughly reviewed the 2014 EU study, APHIS stands by the conclusion of its own 2010 peer-reviewed study, which found that the risk of CBS is unlikely to be meaningfully increased by the commercial importation of citrus. Defendants further assert that their reasoning for rejecting that study can be properly discerned from the administrative record as a whole, and therefore they need not have provided additional rationale in their response to comments in the Final Rule.

As an initial matter, Defendants are correct that the rationale for favoring the 2010 study over the EU study need not be apparent from the response to comments in the Final Rule, so long as "the record as a whole satisfies the APA's requirements[.]" *Epsilon Elecs., Inc.* v. *Dep't of Treasury*, 857 F.3d 913, 925 (D.C. Cir. 2017). In 2010, APHIS concluded that fruit was not a likely pathway for CBS, because the causal organism has two life cycle stages – a sexual and an asexual stage – and the asexual stage is

not the primary source of spread of the pathogen. AR3048-49 (explaining that the sexual stage is primarily responsible for spreading the pathogen to new areas, while the asexual stage "may be responsible for increasing the disease within the same or nearby plants"). Because infected fruit produce only asexual stage pathogens, they are not likely to lead to the spread of the disease. *Id.*

Here, the record indicates that APHIS has thoroughly reviewed the body of academic literature regarding the risk of CBS through imported citrus, both before and in response to the EU study, and reaffirmed their conclusion that imported fruit was not a likely pathway for CBS. AR1619-1735; AR2601-16; AR1589-91; AR1593-1603; AR1736; AR1901-08; AR2844 (final rule lifting ban on citrus imports from Uruguay). APHIS reviewed and considered the EU study in 2013, and submitted a detailed response explaining why the conclusions of the EU study were incorrect. AR2601. APHIS also addressed the EU study and its own scientific conclusions about the unlikelihood of CBS transmission through infected fruit in the Final Rule itself. AR5 ("We disagree with the EU regarding the transmissibility of [CBS] via commercially produced fruit."); AR7 ("pycnidiospores, the asexual stage, do not play a significant role in the disease cycle"); *id.* (transmission would require "a combination of biological and climatic conditions that are unlikely to occur").

The agency considered the proper factors and determined that the risk of CBS transmission through infected fruit was unlikely. That determination was not arbitrary and capricious or an abuse of discretion. *Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) ("Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference."). The Court will not second-guess the agency's determination, as it was based on "scientific judgments and technical analyses within the agency's expertise," an area over which courts are to be "at our most deferential." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (alteration omitted); *see also id.* ("We are not to 'act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty.'") (citation omitted).

Moreover, Plaintiffs' assertion that the agency abused its discretion in not adopting the findings in the EU study is not supported by law. *Cactus Corner, LLC v. U.S. De''t of Agric.*, 346 F. Supp. 2d 1075, 1113 (E.D. Cal. 2004) ("Even if Plaintiffs provided expert evidence to challenge the scientific basis for the Rule which contradicted the Agency's experts, in a "battle of the experts," judicial deference must be accorded the agency's experts unless their opinions are unsupported or wrong" (citations omitted)), *aff'd*, 450 F.3d 428 (9th Cir. 2006); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090 (9th Cir. 2005) ("Courts defer to the evaluations of agencies when the evidence presents conflicting views because an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.") (internal quotation marks and citations omitted).[5]

The agency did not act arbitrarily and capriciously, nor did it abuse its discretion, when it determined that the Final Rule eliminated the risk of CBS spreading through the import of Argentine lemons under the procedures set forth in the Final Rule.

**3.** **Presence of Residential Citrus in California**

Plaintiffs argue that the agency acted unreasonably in failing to account for the ubiquity of residential and commercial citrus in California in promulgating the Final Rule. As both parties acknowledge, the presence of such trees, which can serve as host material for pests and diseases, increases the risk that any pest or disease that makes it to the United States will spread in domestic fruit crops. Defendants argue that the systems approach mitigates the risk that any pest or disease will be introduced in the United States in the first instance. If the pests or diseases are never introduced on U.S. soil, they cannot spread in domestic citrus, thus eliminating the need to consider the prevalence of citrus in California at all. Defendants also point out that they did consider the availability of host material in

---

[5] The Court further notes that, in spite of the agency's conclusion that CBS was not likely to be transmitted through infected fruit, the agency still set forth considerable additional safeguards to prevent infected fruit from ever reaching the United States.

the Pest Risk Assessment. ECF No. 42 at 16 (citing AR3044 ("While California . . . could reasonably receive the highest number of infected fruit only a small portion of the state has a climate suitable for CBS development . . . and the majority of commercial citrus grown in California is not grown in in that area[.]"); AR103 (Pest Risk Assessment noting that *Brevipalpus spp.* mites colonize "more than 900 plant species.").

The administrative record indicates that the agency did not abuse its discretion in failing to consider explicitly the presence of residential citrus in California. The agency did not "entirely fail to consider an important aspect of the problem" because in its scientific judgment, the systems approach would prevent quarantine pests from ever reaching the United States, thus obviating the need to consider the density of residential citrus in California as potential host material. *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007). The Rule endeavors to ensure in the first instance that quarantine pests never leave Argentine, and in the second instance that if they do somehow make it to United States ports, that they are identified during port inspections, and that remedial measures are put in place. In short, the agency considered the quarantine pests, put in place mitigation measures to address those pests before they could ever reach the United States, and determined that these measures ensured that there would be nothing for domestic citrus crops to "host."

Moreover, implicitly, the agency did consider the issue of domestic citrus plants overall in designing the systems approach. The Pest Risk Assessment included an "[a]ssessment of the probability that a plant pest will come into contact with host material" taking into account "the availability, in time and space, of its host plants." AR121. Those assessments led to a protocol for pest-specific mitigation that started well before imported fruit ever reached the port of entry inspection. Plaintiffs have not demonstrated that the agency erred in its assessment of the risks posed by the availability of host material. Whether the agency's planned approach is wise is not for the Court to decide. So long as the requirements of the APA are satisfied, the agency is charged with making such policy decisions within the guidelines set forth by statute and regulation.

### 4. **Foreign Policy Considerations**

Plaintiffs argue that APHIS was impermissibly influenced by foreign policy considerations "rather than science alone" in promulgating the Final Rule lifting the ban on Argentine lemon imports. In support of their argument that foreign policy was impermissibly considered, Plaintiffs point to the fact that after years of considering the Argentine lemon industry, the lifting of the ban was announced just six weeks after President Obama visited Argentina. Thereafter, in April 2017, the President Trump met with President Macri of Argentina. President Trump indicated that he intended to use the lifting of the lemon import ban as a bargaining chip in exchange for Argentina's support in the United States' efforts to negotiate with North Korea. *See* ECF No. 37-2 ¶ 33. Four days after the meeting, APHIS announced that the Rule, the implementation of which had previously been delayed due to the intervening change in administration, would go into effect May, 26, 2017. Defendants counter that there is no evidence in the record to suggest that the timing of these meetings alone is meaningful, nor that these meetings had any bearing on the substance of the Final Rule.

There is simply no support in the record for the proposition that foreign policy considerations overcame the agency's scientific judgment in formulating the rule. Plaintiffs' argument that the timing of President Obama's presidential visit was the impetus for the lifting of the ban is purely speculative and not supported by the record.[6] Even if foreign policy was the impetus for the announcement that the ban was being lifted,[7] there is no evidence in the record, or outside it, to suggest that the agency

---

[6] Plaintiffs suggest that an internal APHIS email indicates that presidential visits might cause APHIS to rush to get a particular rule completed. AR26594 ("for irradiation of India mangos, I think there were site visits done before the final rulemaking, because there was a rush to get the rule completed prior to a presidential visit"). First, there is no suggestion in the record that APHIS rushed to issue this particular rule due to President Obama's visit to Argentina. Moreover, even if they did, there is no evidence that his visit had any impact on the *substance* of the Final Rule.

[7] Defendants also point out that the PPA does contemplate consideration of "international agreements." 7 U.S.C. § 7751(e) ("The Secretary shall ensure that phytosanitary issues involving imports and exports are addressed based on sound science and consistent with applicable international agreements"). Therefore, it differs from *Earth Island Inst. v. Hogarth*, 494 F.3d 757 (9th Cir. 2007), cited by Plaintiffs, which involved the Marine Mammal Protection Act, a statute that specifically prohibited consideration of political matters, and "a record of agency action that contain[s] . . . a compelling portrait of political meddling." *Id.* at 768. There is no similar blanket prohibition on the consideration of politics or international relations in the PPA.

disregarded scientific evidence in favor of foreign policy considerations in coming to its decision, nor that foreign policy considerations had any bearing whatsoever on the *substance* of Rule. Indeed, Plaintiffs argue that President Trump's 2017 meeting with President Macri evinced improper interference with the rulemaking process, but at the time that meeting took place, *the Final Rule had already been issued*. Therefore, President Trump's negotiations with President Macri could not have had any bearing on the notice and comment rulemaking process or the substance of the Final Rule. There is nothing in the record to indicate that foreign policy concerns had an improper bearing on the agency's rulemaking process.

### 5. <u>Northeast Port Limitation</u>[8]

As mentioned, for 2017 and 2018, Argentine lemons will be imported only into the northeastern United States. Plaintiffs argue that the northeast port limitation undermines the substantive rationality of the Rule, because it implies that the systems approach is not sufficient in the short term to protect domestic citrus crops in California from the threat of quarantine pests. (ECF No. 35-1 at 33.) Defendants deny that the northeast port limitation is an implicit concession that the Rule itself is flawed. Rather, Defendants posit that the limitation was a concession, proposed by the Argentine government, to U.S. lemon producers who expressed concerns about the importation of Argentine lemons from both a phytosanitary and an economic perspective.

The northeast port limitation is a temporary restriction on importing Argentine lemons to the west coast. It is set to expire after 2018. (ECF No. 36 at 9-10.) The Final Rule itself does not restrict imports to northeast ports.

---

[8] Plaintiffs argue that the northeast port limitation constitutes a procedural violation of the APA, because the amendment itself should have been subject to notice and comment. As the Court explained in its prior order, "Plaintiffs may have adequately alleged a procedural *violation* with respect to the Amendment, but they have not alleged a procedural *injury*." ECF No. 36 at 19. Plaintiffs do not have standing to make the argument that the northeast port limitation is a standalone procedural violation, and therefore the court will not consider it. However, as the court previously indicated, to the extent that the northeast port limitation "undermines the Final Rule itself, because it suggests that APHIS and the USDA recognized that their rule-making was flawed and sought to address it through the Amendment," the Court will consider Plaintiffs' argument that the limitation renders the Rule arbitrary and capricious. *Id.* at 18 n.6.

There is no evidence in the record to support Plaintiffs' theory that the northeast port limitation undermines the scientific basis for the Final Rule. The record contains a letter from an official from the Argentine Ministry of Agriculture, who wrote that he "read about the concerns of US lemon producers regarding introduction of pests and diseases and of Argentine lemons flooding the US market." AR28334. Although the official characterized the concerns as "unfounded," and affirmed that he believed that there was "thorough scientific support" for the Final Rule, he proposed restricting lemon imports to the North Atlantic "during the first few marketing seasons." *Id.* He more or less characterized this offer as a show of good faith to domestic producers, who were concerned that Argentine producers would flood the market with cheap imports. He indicated that he hoped that the northeast port restriction would "serve to demonstrate the Argentine commitment to supply the US summer lemon market with limited volumes of a high quality product at a time when production and marketing of US lemons is at its lowest." *Id.* In APHIS's response to this request, the agency indicated that it was merely accepting the Argentine government's request, not reconsidering its scientific judgment regarding the wisdom of the Final Rule. *See* AR28337 (affirming APHIS's "firm belief that the rule very effectively manages known pest risks" and expressing concern that imposing a geographic limitation could be interpreted as undermining APHIS's scientific determination).

Contrary to Plaintiffs assertions, there is no "unexplained inconsistency" between the agency's words and its actions. (ECF No. 40 (citing *Dist. Hosp. Partners v. Burwell*, 786 F.3d 1134, 1141 (9th Cir. 2015).) The record tells a consistent story about the rationale for the northeast port limitation. It was a discretionary and voluntary concession by Argentina and APHIS to domestic citrus producers, not a reconsideration of the scientific judgment underpinning the Final Rule. The northeast port limitation does not render the Final Rule arbitrary and capricious.

**D.      RFA Claim**

Plaintiffs argue that they are entitled to summary judgment under the RFA because the agency's assessment of the economic impact of the rule on small businesses was arbitrary and capricious.

30

Plaintiffs also argue that under the APA, the agency failed to consider an important aspect of the problem – namely, the economic impact of the Rule on the domestic citrus industry.

Defendants first ask the Court to reassess its conclusion in the October 25 Order that Plaintiffs have standing, as parties who are only indirectly regulated by the Rule, to challenge the Rule under the RFA. Plaintiffs argue that the Court should not address the question, because it was already raised and addressed in the October 25 Order, and therefore Defendant's request to reconsider is untimely (Fed R. Civ. P. 59(e)) and not in compliance with the Court's rules (Local Rule 230(j)).[9]

In addition to the constitutional requirements of Article III, Plaintiffs' cause of action under the RFA must fall within the "zone of interest" protected by the RFA. Sometimes framed as a question of "prudential standing," the zone-of-interest test "looks to the statutory provisions at issue and asks whether Congress authorized the plaintiff to sue under them." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1119-20 (9th Cir. 2015) (citations omitted); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386-87 (2014) ("prudential standing is a misnomer as applied to the zone-of-interests analysis, which asks whether this particular class of persons ha[s] a right to sue under this substantive statute").

In its October 25 Order, the Court held:

> As to Defendants' second contention that indirectly regulated entities
> cannot bring challenges under the RFA, their contention is undermined by
> the plain language of the statute. Section 611(a)(1) provides that "a small

---

[9] Neither party addresses the application of the "law of the case" doctrine to the Court's reconsideration of this issue. "Under the 'law of the case' doctrine, 'a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.'" *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 19997) (internal citation omitted). "For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in [the] previous disposition." *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000) (alteration in original) (internal citation and quotation omitted). A court has discretion to depart from the law of the case where: "(1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result." *Alexander*, 106 F.3d at 876. Here, the Court concludes that its prior determination was clearly erroneous. Therefore, the Court will reconsider the identical issue here. *See also Robins v. Spokeo, Inc.*, 742 F.3d 409, 411 (9th Cir. 2014) (concluding that law of the case doctrine did not apply to district court's reconsideration of standing argument rejected in the first instance on a motion to dismiss), *vacated on other grounds*, 136 S. Ct. 1540.

entity that is adversely affected or aggrieved by final agency action is entitled to judicial review of agency compliance with the requirements of" the RFA. 5 U.S.C. § 611(a)(1). The statutory language itself does not preclude entities that are aggrieved but not directly regulated from challenging agency compliance. Defendants point to *Mid-Texas Electric Co-operative, Inc., v. FERC*, 773 F.2d 327, 340-41 (D.C. Cir. 1985), to support their position that indirectly regulated entities lack standing under the RFA, but do not explain how the case supports their interpretation. When *Mid-Texas Electric* was decided, § 611(b) explicitly precluded judicial review of the regulatory flexibility analysis prepared under the RFA. 5 U.S.C. § 611(b) (West 1980). That provision of the law was amended in 1996 to allow explicitly for judicial review of the regulatory flexibility analysis as part of the "entire record of agency action." 5 U.S.C. § 611. To the extent that Defendants argue that judicial review should be limited based on the *Mid-Texas Electric* court's examination of the law and its legislative history, that analysis is no longer relevant in light of the intervening change in law.

ECF No. 36 at 20-21. In their summary judgment briefing, Defendants cite two more recent out of circuit cases that explicitly conclude that indirectly regulated small entities do not have statutory authority to challenge an agency action under the RFA. *See White Eagle Co-op. Ass'n v. Conner*, 553 F. 3d 467, 477-81 (7th Cir. 2009); *Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 868-69 (D.C. Cir. 2001). In each of those cases, the Court concluded that a fair reading of 5 U.S.C. § 611(a) in the context of the surrounding statutory provisions, as well as the legislative history, compelled the conclusion that "when the regulation reaches small entities only indirectly, they do not have standing to bring an RFA challenge." *White Eagle Co-op. Ass'n v. Conner*, 553 F.3d 467, 480 (7th Cir. 2009) (concluding that milk producers did not have standing to bring suit under the RFA to challenge new rule impacting milk handlers, even though the rule could indirectly affect the behavior of milk producers in selling to milk handlers). Defendants point to the fact that other provisions of the statutory scheme arguably suggest that only directly regulated small entities are implicated by the RFA and therefore that only directly regulated entities have authority to sue under it. *See* 5 U.S.C. § 604(a)(4) ("Each final regulatory flexibility analysis shall contain . . . a description of and an estimate of the number of small entities *to which the rule will apply*[.]" (emphasis added)); *see also id.* 5 U.S.C. § 603 (imposing same requirements for the initial regulatory flexibility analysis).

Defendants also point to the fact that the specified remedies for prevailing in a challenge under the RFA are "remand[] . . . to the agency" and "deferr[al of] the *enforcement of the rule against small entities*." § 611(a)(4). "[E]nforcement of the rule against small entities" implies that those entities are directly regulated by the rule. Here, Plaintiffs and other small entities affected by the Rule would not be subject to deferred enforcement – nothing is being enforced against them at all. Of course, as Plaintiffs point out, remedies are not limited to those enumerated in the statute, and remand to the agency could redress any potential injury of a non-regulated party.

The Ninth Circuit has not addressed whether the RFA applies to indirectly regulated small entities, although in at least one case, the Ninth Circuit implicitly assumed that indirectly affected small entities had standing to challenge an agency decision under the RFA. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078, 1101 (9th Cir. 2005), *as amended* (Aug. 17, 2005) (American cattle ranchers had standing to challenge a decision to allow the import of Canadian cattle under the RFA); *see also Harlan Land Co.*, 186 F. Supp. 2d at 1097 (remanding APHIS's rule lifting the import ban on Argentine lemons for consideration of the impact on domestic citrus growers under the RFA). Whether indirectly regulated small entities can challenge an agency determination under the RFA remains an open question in this this circuit.

However, the Ninth Circuit employs a similar approach to the D.C. Circuit, albeit using different language, to determine whether a plaintiff falls within the zone of interest of a particular statute. As the Ninth Circuit has noted, "[w]hether a plaintiff comes within the zone of interests is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1120 (9th Cir. 2015) (internal citations and quotation marks omitted). In answering that question here, the Court is persuaded by the reasoning of the D.C. and Seventh Circuits that the RFA was only designed to reach small entities directly regulated by the Final Rule. Despite the apparently broad language in 5 U.S.C. § 611(a) giving "a small entity that is adversely affected or aggrieved by final

agency action is entitled to judicial review of agency compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610," the statutory scheme, taken as a whole, indicates that Congress intended the agency to consider the effects of the regulation on small entities to which the rule itself would apply. In particular, § 611(a) contemplates judicial review for compliance with § 604. Section 604 in turn requires the agency to consider the effect of agency action on small entities "to which the rule will apply." § 604(a)(4). Therefore, the judicial review contemplated in § 611 is circumscribed by the smaller subset of small entities who are within the zone of interest of the statute. *See also Cement Kiln Recycling Coal.*, 255 F.3d at 869 ("Congress did not intend to require that every agency consider every indirect effect that any regulation might have on small businesses in any stratum of the national economy."). Notwithstanding APHIS's decision to go beyond the requirements of §§ 603 and 604 by completing a regulatory flexibility analysis for domestic citrus growers, the Court concludes that the agency was not required to do so by the RFA. Therefore, Plaintiffs, who are not directly regulated by the Final Rule, do not have an injury contemplated within the zone of interest of the RFA.

Even if Plaintiffs did fall within the zone of interest under the RFA, and the agency was therefore obliged to complete a regulatory flexibility analysis that assessed the effect of the Rule on domestic growers, the agency's regulatory flexibility analysis was not arbitrary and capricious. Plaintiffs principal contention is that the agency irrationally and arbitrarily assumed that the volume of lemons imported would be 15,000 to 20,000 metric tons. Plaintiffs posit that the correct number is higher, based on a public statement made by a representative of the Argentine Citrus Federation (AR275 (speculating that imports would range from 20,000 to 30,000 metric tons), and a report prepared by Plaintiff U.S. Citrus Science's own economist (AR275; AR284). Defendants counter that the volume determined by agency experts was based on historical data and was not arbitrary and capricious. Moreover, they contend that even if the export assumption used was lower than what it should have been, more exports would only increase the overall welfare of consumers and thus would not ultimately change the agency's opinion that the Rule has a net social benefit under the RFA.

The agency's assumption was based on sound reasoning, drawn from Argentina's historical export levels during the 2000-2001 period when Argentina did export lemons to the United States. AR43. The agency did not act irrationally or arbitrarily in adopting this assumption in its analysis in lieu of those proposed by Plaintiffs. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d at 1090. Therefore, even if the Court concluded that Plaintiffs had standing under the RFA, the Court finds no fault in the regulatory flexibility analysis that would merit vacating the Final Rule.

**E.    NEPA**

Lastly, Plaintiffs argue that APHIS violated NEPA, 42 U.S.C. § 4332, by failing to prepare an environmental impact statement ("EIS") or an environmental assessment ("EA") in connection with the Rule. Under NEPA and its implementing regulations, agencies are required to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." *Id.*

An agency may prepare an environmental assessment ("EA") to determine whether an EIS is needed. 40 C.F.R. § 1501.4(b). If the EA shows that the agency action may significantly affect the environment, then the agency must prepare an EIS. *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010). If an agency concludes in its EA that the proposed action will not have a significant environmental impact, then it may issue a finding of no significant impact and proceed without further study. *See Te–Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 599 (9th Cir. 2010). NEPA's requirement that agencies "study, develop, and describe appropriate alternatives . . . applies whether an agency is preparing an [EIS] or an [EA]." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (per curiam) (citations omitted). Although an agency must still "give full and meaningful consideration to all reasonable alternatives" in an EA, the agency's obligation to discuss alternatives is less than in an EIS. *Id.* "The existence of a viable but unexamined alternative renders an [EA] inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (citations omitted).

Under NEPA, each agency may identify "categorical exclusions" which are categories of actions which do not, individually or cumulatively, have a significant effect on the human environment and therefore, do not require an EIS or an EA. 40 C.F.R. § 1508.4. "[A]n agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation." *Ala. Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 857 (9th Cir. 1999).

It is undisputed that APHIS did not produce any environmental document pursuant to NEPA. Defendants argue that the Final Rule falls within APHIS's established categorical exclusion for routine measures, 7 C.F.R. § 372.5(c)(1).

Here, Defendants argue that the procedures outlined in the systems approach implemented by the Final Rule fall within the agency's exception for "routine measures" – "such as identifications, *inspections,* surveys, *sampling that does not cause physical alteration of the environment, testing,* seizures, *quarantines,* removals, sanitizing, inoculations, *control,* and *monitoring employed by agency programs* to pursue their missions and functions." 7 C.F.R. § 372.5(c)(1)(i). Plaintiffs counter that the action here creates "grave environmental and phytosanitary risks" and therefore the exclusion does not apply. ECF No. 40 at 29. Neither party provides a full discussion of the categorical exclusion issue here or the NEPA claim.

At first glance, it seems counter-intuitive co conclude that the lifting of the ban itself is a "routine measure." Although the systems approach includes some activities that fall within the category of routine measures, lifting a ban on imports that has spanned eight decades can hardly be categorized as "routine." However, there is language within APHIS's categorical exclusion rule that permits such an interpretation. Under APHIS regulations governing the classification of actions for NEPA purposes, agency actions in which "the means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves" may be categorically excluded from the requirement to prepare an EA or an EIS. 7 C.F.R. § 372.5(c). APHIS's NEPA classification

regulation specifically identifies a number of types of activities that may be categorically excluded, including the "routine measures" provision discussed above.

This Court's decision in *Cactus Corner, LLC v. U.S. Department of Agriculture*, provides some guidance in reviewing APHIS's application of that provision. 346 F. Supp. 2d 1075, 1122 (E.D. Cal. 2004), *aff'd*, 450 F.3d 428 (9th Cir. 2006). In *Cactus Corner*, plaintiffs challenged APHIS's decision to allow for the import of Spanish clementines under conditions aimed at preventing the introduction of the Medfly pest to the United States. Plaintiffs challenged the agency's failure to file an EIS or EA. Defendants argued that the action fell within the agency's categorical exclusion under 7 C.F.R. § 372.5(c). The Court agreed that the rule qualified generally as one in which the "means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves," reasoning:

> [T]he nature and purpose of the Rule itself, aimed at the prevention of Medfly introduction into the United States, is designed to protect human health and the environment. Its risk analyses adequately address all issues of environmental concern, particularly the threat of the spread of Medflies, the risk to plant life (crops), and the risk to consumers who could encounter larvae in a fruit. . . . Plaintiffs have not shown that the Secretary's assertion of categorical exclusions, supported by substantial record evidence, requires the Secretary's further explanation under NEPA or what such an explanation would address. . . . The Rule itself is aimed at effectively <u>preventing</u> Medfly importation into the United States, to protect human health and the environment. <u>The Rule's corrective measures do not pose new environmental hazards (such as the application of new or untested pesticides post-entry); rather, the environmental impact of the Rule itself is salutary</u>. Phytosanitary practices are to be implemented in Spain; cold storage will be supplied in Spain, in transit, and in the U.S.; sampling and testing of fruit will be conducted at all stages from production in the field, through import and ultimate delivery to the consumer. The "hard look" analysis required by the NEPA is unnecessary and inapplicable because the Rule's design and its overall purpose is protection of the environment and human health. Even assuming a "hard look" must be taken, the Secretary has done so. The agency correctly relies on applicable categorical exclusions from the NEPA's EIS and EA requirements.

*Id.* at 1122 (internal citations omitted) (emphasis added). More specifically, *Cactus Corner* emphasized the applicability of the routine measures categorical exclusion, which encompasses inspections,

sampling, testing, quarantines, control, and monitoring. *Id*. at 1120 (italicizing those aspects of the routine measures categorical exclusion). *Cactus Corner* stands for the proposition that it is appropriate, as a general matter, for APHIS to apply its routine measures categorical exclusion to a rule that, on its face, permits importation of a crop that has historically been excluded, so long as "routine measures" are used to eliminate environmental impacts.

*Cactus Corner* is indistinguishable from the facts of this case. Here too, the Final Rule's "design and overall purpose is the protection of the environment and human health." The Final Rule contains the means for avoiding environmental impacts within the Rule itself. Indeed, the purpose of the Rule is to permit Argentine lemons to be imported to the United States under "conditions designed to prevent the introduction of . . . quarantine pests." 7 C.F.R. § 319.56-76.

The purpose of the Rule is to prevent the introduction of quarantine pests in the United States. Likewise, as the Court concluded above, the agency's determination that the Final Rule mitigated the risk of quarantine pests establishing in the United States was not arbitrary and capricious. The record further shows that, as in *Cactus Corner*, the systems approach itself does not introduce new environmental risks to the United States. Therefore, the agency's interpretation that the Final Rule falls within a categorical exclusion to NEPA for rules designed to avoid or minimize adverse environmental impacts is entitled to deference. 7 C.F.R. § 372.5(c). Defendant is entitled to summary judgment on Plaintiffs' NEPA claim.

Plaintiffs do not suggest that *Cactus Corner* was wrongly decided.[10] Rather, they maintain that

---

[10] In so holding, the Court does not find it necessary to fully embrace *Cactus Corner's* seemingly broad interpretation of 7 C.F.R. § 372.5(c) to exclude from NEPA's requirements any agency action in which "the means through which adverse environmental impacts may be avoided or minimized have actually been built right into the actions themselves." That quoted language appears to create a broad category of agency actions that are categorically excluded. *Id.* However, when read in context, that language could also be interpreted as a narrative justification for categorically excluding the specific, listed examples of excluded actions, along with other, similar actions. For example, the regulation lists "[p]esticide treatments applied to infested plants at a nursery" and "[i]solated (for example, along a highway) weed control efforts" as examples of types of "routine measures" that are excluded under § 372.5(c). Viewing the Final Rule as lifting a long-standing ban on lemon imports from Argentina, the Rule is broader in scope and scale than any of the enumerated examples. But, the Rule can also be viewed as an amalgamation of many "routine measures" – including "identifications, inspections, surveys, sampling that does not cause physical alteration of the environment, testing, seizures, quarantines, removals, sanitizing, . . .

the record in this case supports a finding that the risks posed by the Rule are "environmentally

significant." In evaluating this argument, the Court looks to *Center for Food Safety v. Johanns*, 451 F.

Supp. 2d 1165, 1185 (D. Haw. 2006), which refused to permit APHIS to apply a categorical exclusion to

APHIS's decision to permit private parties to plant genetically modified sugarcane on several Hawaiian

islands. There, the court found that APHIS erred by failing to consider an exception to its categorical

exclusion rule which required preparation of an EA or EIS "[w]henever the decisionmaker determines

that a categorically excluded action may have the potential to affect 'significantly' the quality of the

'human environment,' as those terms are defined at 40 CFR 1508.27 and 1508.14, respectively." 7

C.F.R. § 372.5(d). In fact, the regulation contained a specific example of such an exceptional

circumstance: "when a confined field release of genetically engineered organisms or products involves

new species or organisms or novel modifications that raise new issues." *Id*. at § 372.5(d)(4). The

*Johanns* court found APHIS's decision to apply a categorical exclusion arbitrary and capricious because

there was "substantial evidence that an exception to the categorical exclusion may apply" and that

therefore "APHIS was required to provide some explanation as to why, in its view, the exceptions did

not apply." 451 F. Supp. 2d at 1186.

The present case is different. Not only is there no specific example provided in the exception

provision that even arguably applies here,[11] as discussed above, APHIS correctly concluded that the

---

control, and monitoring" – designed to all but eliminate potential environmental impacts from the importation of
contaminated fruit. This is, at its core, what *Cactus Corner* held in connection with the lifting of the clementine ban. Given
that the parties do not challenge *Cactus Corner's* reasoning, and given that it was affirmed by the Ninth Circuit (albeit on
different grounds), the Court defers to its narrow reasoning regarding the "routine measures" exemption here.

[11] The full list of examples given by APHIS of situations in which EAs or EIS's should be prepared despite the potential
application of a categorical exclusion is:

(1) When any routine measure, the incremental impact of which, when added to other past, present, and reasonably
foreseeable future actions (regardless of what agency or person undertakes such actions), has the potential for
significant environmental impact;
(2) When a previously licensed or approved biologic has been subsequently shown to be unsafe, or will be used at
substantially higher dosage levels or for substantially different applications or circumstances than in the use for
which the product was previously approved;
(3) When a previously unlicensed veterinary biological product to be shipped for field testing contains live
microorganisms or will not be used exclusively for in vitro diagnostic testing; or
(4) When a confined field release of genetically engineered organisms or products involves new species or

39

Rule and its systems approach will be sufficiently protective to avoid environmentally significant impacts.

## V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, Plaintiffs' motion for summary judgment (ECF No. 35) is DENIED, and Defendants' motion for summary judgment (ECF No. 37) is GRANTED as to the remaining counts in the Amended Complaint.

The Clerk of Court is directed to ENTER JUDGMENT in favor of Defendants and against Plaintiffs and to CLOSE THIS CASE.

IT IS SO ORDERED.

Dated:   **February 27, 2018**          **/s/ Lawrence J. O'Neill**
                                        UNITED STATES CHIEF DISTRICT JUDGE

organisms or novel modifications that raise new issues.
7 C.F.R. § 372.5.